1   KEITH A. JACOBY, Bar No. 150233
    kjacoby@littler.com
2   LITTLER MENDELSON, P.C.
    2049 Century Park East, 5th Floor
3   Los Angeles, CA  90067.3107
    Telephone:    310.553.0308
4   Fax No.:      310.553.5583

5   MICHELLE B. HEVERLY, Bar No. 178660
    meverly@littler.com
6   SOPHIA BEHNIA, Bar No. 289318
    sbehnia@littler.com
7   LITTLER MENDELSON, P.C.
    650 California Street, 20th Floor
8   San Francisco, CA  94108.2693
    Telephone:    415.433.1940
9   Fax No.:      415.399.8490

10  MIREYA A.R. LLAURADO, Bar No. 194882
    mallaurado@fedex.com
11  FEDEX FREIGHT, INC.
    3425 Victor Street
12  Santa Clara, CA  95054
    Telephone: 408.654.3186
13  Facsimile: 408.654.3297

14  Attorneys for Defendant
    FEDEX FREIGHT, INC.

15

16                    UNITED STATES DISTRICT COURT

17                   EASTERN DISTRICT OF CALIFORNIA

18  ROY D. TAYLOR, on behalf of himself      Case No.  1:13-cv-01137-LJO-BAM
    and all others similarly situated,
19                                           **REQUEST FOR JUDICIAL NOTICE IN**
                        Plaintiff,           **SUPPORT OF DEFENDANT'S**
20                                           **OPPOSITION TO MOTION FOR CLASS**
    v.                                       **CERTIFICATION**
21
    FEDEX FREIGHT, INC., an Arkansas         Date: January 16, 2015
22  Corporation; and DOES 1 through 10,
    inclusive,                               Time:  9:00 a.m.
23
                        Defendants.          Courtroom: 8. Hon. Barbara A. MacAuliffe
24

25

26

27

28

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

Case No.  1:13-cv-01137-LJO-BAM
RJN IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

In support of its Opposition to Plaintiff's Motion For Class Certification, Defendant FedEx Freight, Inc. ("FXFI") respectfully requests that the Court take judicial notice of the following documents pursuant to Federal Rule of Evidence 201:

1.      § 2, *et. seq.* of the 2002 Division of Labor Standards Enforcement Policies and Interpretations Manual, a true and correct copy of which is attached hereto as **Exhibit A**.

2.      § 47, *et. seq.* of the 2002 Division of Labor Standards Enforcement Policies and Interpretations Manual, a true and correct copy of which is attached hereto as **Exhibit B**.

3.      Legislative Counsel's Digest, Senate Amendments to Bill No. 435 (2012-2013 Reg. Sess.), a true and correct copy of which is attached hereto as **Exhibit C**.

4.      California Industrial Welfare Commission Wage Order 9, a true and correct copy of which is attached hereto as **Exhibit D**.

5.      Order Denying Reconsideration Of Grant of Motion to Compel Arbitration, *Fardig v. Hobby Lobby Stores, Inc.,* Case No. SACV 14-00561 JVS(ANx) (C.D. Cal. August 11, 2014), a true and correct copy of which is attached hereto as **Exhibit E**.

6.      Order Granting Defendant's Motion For Summary Judgment, *Ortega v. JB Hunt Transportation, Inc.,* Case No. 2:07-cv-08336-BRO-SH (C.D. Cal. June 4, 2014.), a true and correct copy of which is attached hereto as **Exhibit F**.

7.      Findings And Recommendations Granting Plaintiff's Motion For Class Certification; Order Denying Plaintiff's Motion To Strike, *Lindell v. Synthes USA*, 2014 U.S. Dist. LEXIS 27706 (E.D. Cal. March 4, 2014), a true and correct copy of which is attached hereto as **Exhibit G**.

8.      Opinion, *Forrand v. Federal Express Corp.,* 2013 U.S. Dist. LEXIS 62252 (C.D. Cal. April 25, 2013), a true and correct copy of which is attached hereto as **Exhibit H**.

9.      Opinion, *Ginsburg v. Comcast Cable Comm'ns Mgmt. LLC*, 2013 U.S. Dist. LEXIS 55149 (W.D. Wash. Apr. 17, 2013), a true and correct copy of which is attached hereto as **Exhibit I**.

///

///

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

1.

Case No.  1:13-cv-01137-LJO-BAM
RJN IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

10.     Order To Adopt Findings And Recommendations On Class Certification, *In re Taco Bell Wage and Hour*, 2013 WL 28074 (E.D. Cal. Jan. 2, 2013), a true and correct copy of which is attached hereto as **Exhibit J**.

11.     Minute Order (1) Granting Defendant's Motion For Judgment On The Pleadings, In Part; (2) Granting Defendant's Motion For Decertification, In Part; And (3) Denying Plaintiff's Motion For Order To Mail Class Notice (In Chambers), *Cole v. CRST, Inc.*, 2012 U.S. Dist. LEXIS 144944 (C.D. Cal. Sept. 27, 2012), a true and correct copy of which is attached hereto as **Exhibit K**.

12.     Opinion, *Lamps Plus Overtime Cases,* 2012 Cal. App. LEXIS 950 (August 20, 2012), a true and correct copy of which is attached hereto as **Exhibit L**.

13.     Order Denying Plaintiff's Motion For Class Certification, *Cortez v. Best Buy,* 2012 U.S. Dist. LEXIS 15190 (C.D. Cal. Jan. 25, 2012) a true and correct copy of which is attached hereto as **Exhibit M**.

14.     Order Granting in Part and Denying in Part Plaintiffs' Motion For Class Certification, *Parrish v. NFL Players Ass'n & NFL Players Inc.*, 2008 U.S. Dist. LEXIS 120158 (N.D. Cal. Apr. 29, 2008), a true and correct copy of which is attached hereto as **Exhibit N**.

15.     Civil Minutes – General – Written Opinion, *Love v. Wilson*, 2007 U.S. Dist. LEXIS 101957 (C.D. Cal. Nov. 15, 2007), a true and correct copy of which is attached hereto as **Exhibit O**.

16.     Court's Ruling And Order Re: Determination Of Threshold Legal Issues, *Kettenring v. Los Angeles Unified School District,* Case No. BC343665 (LA Superior Court, June 16, 2006), a true and correct copy of which is attached hereto as **Exhibit P**.

17.     Order On Motion To Decertify Class, *Benton v. Tanintco*, Case No. BC349267 (LA Superior Court, May 2, 2012), a true and correct copy of which is attached hereto as **Exhibit Q**.

18.     Order Granting Motion To Decertify Class, *Wackenhut Wage and Hour Cases,* Case No. JCCP 4545 (LA Superior Court, August 1, 2012), a true and correct copy of which is attached hereto as **Exhibit R**.

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

2.                              Case No.  1:13-cv-01137-LJO-BAM
RJN IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

19. Public Law Number 103-305, Title VI, § 601(a)(1), 108 Stat. 1569, 1605 (1994), a true and correct copy of which is attached hereto as **Exhibit S.**

20. Order On Motion To Decertify Class, *Carson v. Knight Transportation*, Case No. VCU234186 (Tulare County Superior Court; August 30, 2012), a true and correct copy of which is attached hereto as **Exhibit T**.

21. Ruling on Plaintiff's Motion For Summary Adjudication, *Carson v. Knight Transportation*, Case No. VCU234186 (Tulare County Superior Court; August 30, 2012), a true and correct copy of which is attached hereto as **Exhibit U**.

Federal Rule of Evidence 201(b) permits courts to take judicial notice of any fact "not subject to reasonable dispute" which is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Courts may properly take judicial notice of orders of other courts or orders of the same court in a different case. (*Ferdowsnia v. Std. Ins. Co.*, 2011 U.S. Dist. LEXIS 53807, *9, fn.5 (N.D. Cal. May 10, 2011); *Johnson v. Mitchell*, 2011 U.S. Dist. LEXIS 44367, *21, fn.3 (E.D. Cal. Apr. 25, 2011); *Onkvisit v. Board of Trs.*, 2011 U.S. Dist. LEXIS 42401, *8 (N.D. Cal. Apr. 13, 2011) ("Decrees, orders, and judgments of other courts are subject to judicial notice under Fed. R. Ev. 201"), citing *Papai v. Harbor Tug and Barage*, Co., 67 F.3d 203, 207 (9th Cir. 1995)).  Accordingly, FXFI submits that judicial notice may be properly taken as requested herein.

Dated:  October 15, 2014

*/s/ Sophia Behnia*
MICHELLE B. HEVERLY
SOPHIA BEHNIA
LITTLER MENDELSON, P.C.
Attorneys for Defendant
FEDEX FREIGHT, INC.

Firmwide:129199957.1 057116.1015

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

3.

Case No.  1:13-cv-01137-LJO-BAM

RJN IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# EXHIBIT A

DIVISION OF LABOR STANDARDS ENFORCEMENT
ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

2        WAGES.

2.1      Initially, it is necessary to establish that, in fact, an employer-employee relationship exists. The term "employee" is variously defined in the Wage Orders depending on the extent of the protections which the IWC intended (e.g., definition in Wage Order 5, Section 2(F) covering lessees and Section 2(G) defining employee in the Healthcare Industry) . Generally, the term means any person employed by an employer.

2.2      "Employer", Defined: The definition of employer for purposes of California's labor laws, is set forth in the Wage Orders promulgated by the Industrial Welfare Commission at Section 2 (see Section 55.2.1.2 of this Manual), and reads in relevant part as follows:

> "Employer" means any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person. (E.g., 8 CCR §11090(2)(F))

2.2.1    As explained in detail at Section 37.1.2 of this Manual, it is possible that two separate employer entities (joint employers) may share responsibility for the wages due an employee. Also, at Section 28 of this Manual, there is a detailed discussion on how to distinguish between an employee and an independent contractor.

2.3      Labor Code § 200.

> As used in this article:
>
> (a) "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.
>
> (b) "Labor" includes labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other arrangement if the labor to be paid for is performed personally by the person demanding payment.

2.4      Definition Of Wage . A wage is defined as money' or other value which is received by an employee as compensation for labor or services performed. It is common to think of "wages" as that amount received by an employee on a designated payday; but the courts have held that the term also includes:

> "...money as well as other value given, including room, board and clothes. (Schumann v. California Cotton Credit Corp. (1930) 105 Cal.App. 136, 140) " '[T]he term 'wages' should be deemed to include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as a part of his compensation. [Citations.]' "(Department of Industrial Relations, DLSE v. UI Video Stores, Inc. (1997) 55 Cal.App.4th 1084, 1091)

2.4.1    A case involving a violation of a statutory requirement that prevents an employer from passing on costs to an employee may not, at first glance, appear to involve a claim for "wages"; but, as the court in the UI Video Stores case pointed out, the real effect of such a statute "is to increase the...employees' wages by the amount which in the absence of

---

'Except for the very limited exceptions found in Labor Code § 213, all wages due the employee on a designated payday must be paid in cash or by an instrument negotiable and payable in cash as provided by Labor Code § 212(a)(1) . (See also, Section 9 of this Manual)

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

2.4.1.1    Premium pay required by the Labor Code and IWC Wage Orders such as overtime premium, meal period premium, rest period premium, reporting time pay and split shift premium are "wages." *Murphy v. Kenneth Cole* (2007) 40 Cal.4th 1094.

2.4.2    The amount of money which is received may be a fixed sum, or it may be ascertained or determined by standard of time, task, piece, commission or by other method of calculation.  (Labor Code § 200).

2.4.3    Thus, an amount of compensation may be paid to an employee for labor or services and may be measured by hour, day, week, month, year, or any other subdivision of time (e.g., a yearly "salary").

2.4.4    A wage is also defined as a specified sum or amount which is paid to an employee in exchange for a given time of service to an employer, or a fixed sum which is paid for a specified piece of work (e.g., "piecework").

2.4.5    In the final analysis, wages are considered to be compensation paid to a person who is employed to perform labor or services for another person or entity.

2.5    The analysis used to determine what method of compensation the wage is based on is usually simply. However, there are cases where it is not entirely clear at first glance whether the compensation is based on commissions or piece rate.

2.5.1    **Piece Rate or "Piece Work".**  "Work paid for according to the number of units turned out." (AMERICAN HERITAGE DICTIONARY definition.)  Consequently, a piece rate must be based upon an ascertainable figure paid for completing a particular task or making a particular piece of goods.

2.5.2    Examples of piece rate plans can be as diverse as the following:

1.  Automobile mechanics paid on  a "book rate" (i.e., brake job, one hour and fifty minutes, tune-up, one hour, etc.) usually based on the Chilton Manual or similar;

2.  Nurses paid on the basis of the number of procedures performed;

3.  Carpet layer paid by the yard of carpet laid;

4.  Technician paid by the number of telephones installed;

5.  Factory worker paid by the widget completed;

6.  Carpenter paid by the linear foot on framing job.

2.5.3    A piece rate plan of compensation may include a group of employees who share in the wage earned for completing the task or making the product.

**2-2**                                                                                      **MAY, 2007**

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

2.5.4   **Commission**.  Labor Code § 204.1 defines commissions as: "Compensation paid to any person for services rendered in the <u>sale</u> of such employer's property or services and based proportionately upon the amount or value thereof."  *Keyes Motors v. DLSE* (1987) 197 Cal.App.3d 557.  If the compensation is based on a percentage of a sale, the compensation plan is a commission.  On the other hand, a compensation plan which pays employees for the number of pieces of goods finished, the number of appointments made or the number of procedures completed, is based on a piece rate,

MAY, 2007

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

not a commission rate; though such compensation plans often refer to the payment as "commission".

2.5.4.1   Again, as with a piece rate plan, a commission plan may include a group of employees who share in the commissions earned. (See detailed discussion of commissions at Section 34 of this Manual)

2.5.5   Bonus Defined. A bonus is money promised to an employee in addition to the monthly salary, hourly wage, commission or piece rate usually due as compensation. The word has been defined as: "An addition to salary or wages normally paid for extraordinary work. An inducement to employees to procure efficient and faithful service." Duffy Bros. v. Bing & Bing, 217 App.Div. 10, 215 N.Y.S. 755, 758 (1939). Bonuses may be in the form of a gratuity where there is no promise for their payment; or they may be a contractually required payment where a promise is made that a bonus will be paid in return for a specific result (i.e., exceeding a minimum sales or piece quota). (See detailed discussion of Bonuses at Section 35 of this Manual)

2.5.5.1   Piece rate and commission plans may be in addition to an hourly rate or a salary rate of pay. Such plans may also be in the alternative to a salary or hourly rate. As an example, compensation plans may include salary plus commission or piece rate; or a base or guaranteed salary or commission or piece rate whichever is greater.

2.5.5.2   Bonus Plans Distinguished. Bonuses are in addition to any other remuneration rate and are predicated on performance over and above that which is paid for hours worked, pieces made or sales completed. A bonus is paid over and above wages earned for extraordinary work performance or as an inducement to employees to remain in the employ of the employer.

2.6   Wages Not Ordinary Debts. The California and federal courts have established the principle that wages are not ordinary debts. They are preferred over all other claims because of the economic position of the average worker and his/her dependence on the regular payment of wages for the necessities of life. IWC v. Superior Court Kern County (1980) 27 Cal.3d 690; 166 Cal.Rptr. 331 (appeal dism., cert. den. 101 S.Ct. 602; 449 U.S. 1029; Reid v. Overland Machined Products (1961) 55 Cal.2d 203; 359 P.2d 251; 10 Cal.Rptr. 819. In the later case of Boothby v. Atlas Mechanical, Inc. (1992) 6 Cal.App.4th 1595, 1601, the court noted that under California law, wages "are jealously protected by statutes for the benefit of employees."

2.6.1   Both California and federal law prohibit imprisonment for debt (unlawful and violative of individual rights). It should be noted, however, that the courts have upheld criminal cases which involved imprisonment for failure to pay wages when there is the ability to pay. Cases define the analytical framework applicable to claimed violations of the prohibition against imprisonment for debt.

2.6.2   It is not, however, every failure to pay wages which is subject to criminal sanctions. In In re Trombley (1948) 31 Cal.2d 801, the court reviewed the assertion that Labor Code § 216, violated the prohibition against imprisonment for debt. Citing the fraud exception to the imprisonment for debt prohibition, the court noted the prohibition

# DIVISION OF  LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND  INTERPRETATIONS MANUAL

was "adopted to protect the poor but honest debtor who is unable to pay his debts, and [was] not intended to shield a dishonest man who takes an unconscionable advantage of another." The court recognized that wages were not ordinary debts, that workers are particularly dependent on wages and that it was a matter of essential public policy that workers receive their pay when due. The court stated: "An employer who knows that wages are due, has the ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee.  Such conduct amounts to a 'case of fraud' within the meaning of the exception to the constitutional prohibition and may be punished by statute." Trombley's formulation has been applied and expanded in subsequent cases.

2.7     Extension Of Enforcement Coverage Of California Wage Statutes To Some Public Employees.  Effective January 1, 2001, Labor Code § 220 has been amended to extend coverage of  Division 2, Part 1, Chapter 1, Article 1 (§§ 200-243)  to employees of the State of California except §§ 201.5, 201.7, 203.1, 203.5, 204, 204a, 204b, 204c, 204.1, 205, and 205.5.

2.7.1   Note. Labor Code § 220(b) still exempts counties, incorporated cities, towns or other municipal corporations from the provisions of Labor Code §§ 200-211 and 215-219.

2.7.1.1  The above would include such entities as hospital districts, etc. (See DLLE v. El Camino Hospital District (1970) 8 Cal.App.3d, Supp. 30)

# EXHIBIT B

DIVISION OF LABOR STANDARDS ENFORCEMENT
ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

47 CALCULATING HOURS WORKED.

47.1 Rounding. The Division utilizes the practice of the U.S. Department of Labor of "rounding" employee's hours to the nearest five minutes, one-tenth or quarter hour for purposes of calculating the number of hours worked pursuant to certain restrictions. (29 CFR § 785.48(b))

47.2 "Rounding" Practices. As mentioned above, the federal regulations allow rounding of hours to five minute segments. There has been practice in industry for many years to follow this practice, recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted by DLSE, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked. (See also, 29 CFR § 785.48(b))

47.2.1 Recording Insignificant Time Periods. In recording working time, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946); Lindow v. United States 738 F.2d 1057 (9th Cir.1984)) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities.

47.2.1.1 An employer may not rely on this policy to arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him. See Glenn L. Martin Nebraska Co. v. Culkin, 197 F. 2d 981, 987 (C.A. 8, 1952), cert. denied, 344 U.S. 866 (1952), rehearing denied, 344 U.S. 888 (1952), holding that working time amounting to $1 of additional compensation a week is "not a trivial matter to a workingman," and was not de minimis; see also Addison v. Huron Stevedoring Corp., 204 F. 2d 88, 95 (C.A. 2, 1953), cert. denied 346 U.S. 877, holding that "[T]o disregard workweeks for which less than a dollar is due will produce capricious and unfair results;" and Hawkins v. E. I. du Pont de Nemours & Co., 12 W.H. Cases 448, 27 Labor Cases, para. 69,094 (E.D. Va., 1955), holding that 10 minutes a day is not de minimis.

47.2.2 Differences Between Clock Records And Actual Hours Worked. Time clocks are not required but in those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work.

47.2.2.1 Actual facts must be investigated, of course, however, unless the employee is either performing work during the period or has been directed by the employer to be on the premises, the early or late clock punching may be disregarded. Minor differences between the clock records and actual hours worked cannot ordinarily be avoided, but

# DIVISION OF LABOR STANDARDS ENFORCEMENT
## ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

major discrepancies should be investigated since they raise a doubt as to the accuracy of the records of the hours actually worked.

47.2.2.2   DLSE Enforcement Policy.  When auditing payroll records, Division personnel will ascertain the facts regarding the time keeping requirements (i.e., the true work patterns of the workers and whether these patterns are accurately reflected by the time records). When, based on these facts, the above description results in an averaging out for both the employer and the employee, it is, in the long run, much more reasonable than an attempt at absolute accuracy by "counting minutes".  This method also simplifies payroll computation and the average employer appreciates being permitted to use it.

47.3   Special IWC Provision For Hours Worked – Recess Periods: A special provision in Orders 3, 8, and 13 allows employers to exclude from "hours worked" recess periods occurring during the workday, provided the following conditions are met:

1. the recess must be at least 30 minutes long;

2. the employer must notify the employee of the time to report back to work;

3. the employee must be allowed to leave the premises;

4. no more than two work recesses can occur in a single shift; and

5. the duration of the recesses must not exceed two hours.

47.3.1   Sleep Time And Meal Periods On 24-hour Shifts : Currently, an employer and an employee working as an ambulance driver or attendant on a 24-hour shift may enter into an agreement to exclude up to three 1 hour duty-free meal periods and up to 8 hours of uninterrupted sleep time from "hours worked" provided adequate sleeping facilities are furnished by the employer. (Monzon v. Schaefer Ambulance Service (1990) 224 Cal.App.3d 16.)

47.3.2   Term "Hours Worked" Specially Defined For Employees In The Public Housekeeping Industry Required To Reside On Employment Premises: Except for employees employed in the "Health Care Industry", (as that term is defined) Orders 5-2002, contain a special definition for hours worked by employees in the Public Housekeeping Industry who are required to reside on the employment premises:

". . . in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked."

47.3.2.1   Under this definition, as applied, for instance, to a motel clerk who was required to reside on the motel grounds and to remain there 24 hours a day unless relieved, the California courts have held that only the time spent performing physical, mental or other specified tasks was counted as hours worked.  (Brewer v. Patel (1994) 20 Cal.App.4th 1017.)

47.3.3   Hours Worked Specially Defined For Health Care Industry. Orders 4-2000 and 5-2000 specifically define "hours worked" for purposes of the health care industry as follows:

47 - 2                                                                       JUNE, 2002

DIVISION OF LABOR STANDARDS ENFORCEMENT
ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

> "Within the health care industry, the term 'hours worked' means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act."

47.3.4   Under this federal definition, so long as the employee is relieved of all duties during the time allotted for a meal, the meal period does not constitute "hours worked" even if the employee is prohibited from leaving the employer's premises. (29 CFR §785.19(b); see discussion at Sections 46.6 and 46.6.1.1 of this Manual)

47.3.5   This creates an anomaly since employees in the Health Care Industry (as defined) are subject to the federal regulations concerning the definition of "hours worked" and federal law differs from California law as determined in Brewer v. Patel, supra.

47.3.5.1   The First District Court of Appeal in the case of Brewer v. Patel, supra, defined the IWC Order 5 language which requires that employees required to reside on the premises need only be paid for that time when they are performing assigned duties to allow employers to pay employees who are required to <u>remain</u> on the premises only for the actual time are "performing physical, mental or other specified tasks."

47.3.5.2   Federal Regulations At Odds With California Case Law. The Patel court's definition is at odds with federal law which is to be applied to employees in the "Health Care Industry". The federal regulations require an employer to pay for all the hours the employee is required to be on the premises when such requirement is a condition of the employment. For the past fifty years, federal courts have interpreted the FLSA to require payment for time in which the employee is required to remain on the premises of the employer in order to respond to unscheduled contingencies. As the Court explained in Armour & Co. v. Wantock (1944) 323 U.S. 126, 133:

> "Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity...Readiness to serve may be hired, quite as much as service itself."

47.3.5.3   Thus, unlike the interpretation of the term by the Patel court, under federal rules, "hours worked are not limited to the time spent in active labor but include time given by the employee to the employer." Skidmore v. Swift & Co. (1944) 323 U.S. 134, 138. Instead, federal case law, and DLSE enforcement policy, have focused on how close an on-call employee must remain to the employer's premises to be considered entitled to compensation. This case law is summarized at 29 CFR § 785.17, which states, "An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call'."

47.3.5.4   For Enforcement Purposes, employees in the "Health Care Industry" under the Orders who are subject to federal regulations and are required to live on the employer's premises (residential care facilities, for instance) must be paid for all hours they are required to remain on the employer's premises pursuant to the federal regulations.

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

47.4 **Direction And Control Of The Employer**. The IWC Orders, unlike the federal Fair Labor Standards Act, provide a definition of the term "hours worked." (See Section 46.1, *et seq.* of this Manual).

47.4.1 **Federal Enforcement Policy**. For purposes of the FLSA, the Department of Labor for enforcement purposes, relies upon definitions first set out in the U.S. Supreme Court case of *Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944) holding that employees must be paid for all time spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer of his business." This definition was expanded later in the case of *Anderson v Mt. Clemens Pottery Co.* 328 U.S. 680 (1946) which held that the workweek includes "all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place." The federal regulations provide that "[a]s a general rule the term 'hours worked' will include: (a) All time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so." (29 CFR §778.223)

47.4.2 **Difference In Enforcement Positions**. There is a substantial difference between the definition of hours worked adopted by the IWC and that used by the Department of Labor for enforcement of the FLSA. Under California law it is generally only necessary that the worker be subject to the "control of the employer" or "all the time the employee is suffered or permitted to work" in order to be entitled to pay. See *Morillion v. Royal Packing co.* (2000) 22 Cal.4th 575, 584 [citing to DLSE O.L. 1993.03.31. These two phrases operate independently of each other, so that if time falls into either category, it must be counted as hours worked. (O.L. 2002.01.29).

47.5 **Standby Or Waiting Time.** Generally, an employee who is required to remain at the employer's place of business and respond to emergency calls is working and must be paid for all hours – even if the employee is doing nothing more than waiting for something to happen. The U.S. Supreme Court long ago established the rule that:

> "An employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activities often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. *Armour & Co. v. Wantock*, 323 U.S. 126 (1944)"

47.5.1.1 **May Be Subject To Different Rate Of Pay**. Generally, on-call or standby time at the work site are hours worked that must be paid for. It is possible, however, that the hourly rate of pay for the call time can be different from the regular rate paid for working time so long as the rate is set before the work is performed and the amount of the remuneration does not fall below the applicable minimum wage for any hour working standing alone. (O.L. 2002.02.21). For purposes of overtime computation, the weighted average of such rates is to be utilized in determining the regular rate of pay

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

47.5.2   Uncontrolled Standby.  An employee who has the choice of being available or not available to respond to a request by the employer to return to work for an emergency may be on uncontrolled standby if the employee is completely unrestricted to use his or her time for their own purposes.  Such "free" standby time is not under the control of the employer and, thus, need not be paid.

47.5.3   Stipend For Uncontrolled Standby.  Under some circumstances, employers may pay an employee a stipend for being available in an uncontrolled standby situation to return to work if called.  In these situations, the employee agrees to be available to return to work, but is otherwise free to pursue personal interests without restriction.  The stipend paid for this uncontrolled standby agreement is included, for purposes of California law, in calculating the regular rate of pay for overtime purposes; but the hours for which the stipend is paid is not to be calculated on a weighted average basis.  In other words, the stipend is simply added to the wage earned for actual hours worked and prorated among those hours.

47.5.3.1   Example: Employee is paid $10.00 per hour for all hours worked and is also paid a stipend of $20.00 per day for remaining available to return to work after hours.  The employee works five days of eight hours each and is entitled to $400.00 plus $100.00 stipend for the uncontrolled standby.  In the event the employee actually works 42 hours he is entitled to $525.00.  The stipend is added to the regular rate ($400.00 + $100.00 = $500.00) and divided by the non-overtime hours worked (40) to reach the regular rate for overtime purposes ($12.50).

47.5.4   Controlled Standby.  If the employee's time is so restricted that they cannot pursue personal activities and come and go as he pleases, the employer is considered to have direction and control of the employee.  The DLSE has adopted the test which the California Supreme Court announced in the case of Madera  Police Officers Assn. v. City of Madera (1984) 36 Cal.3d 403, and will apply that test to determine the extent of control.

47.5.4.1   The Madera court applied a two-part preliminary analysis to determine whether the time was compensable.  The first part of the test measures whether the restrictions placed on the employee are primarily directed toward the fulfillment of the employer's requirements and policies?  Second, is the employee substantially restricted so as to be unable to attend to private pursuits?

47.5.4.2   The Madera court also indicated that regarding the second prong of the test, the trier of fact must examine the restrictions cumulatively to assess their overall effect on the worker's uncompensated time.  In other words, the net impact of the restrictions must be considered.  Note that the court did not hold that no restrictions as to time and space could be placed on the employee; only that the restrictions could not be substantial enough to prevent the employee from attending to private pursuits.

47.5.5   Beepers.  The simple requirement that the employee wear a beeper, standing alone, doesn't require the employee be paid for all the hours the beeper is on.

47.5.5.1   Federal Cases.  While there are no reported California state cases directly on point, the federal case of Berry v. County of Sonoma, 30 F.3d 1174 (9th Cir.1994),  discusses the

DIVISION OF LABOR STANDARDS ENFORCEMENT
ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

problems raised in determining, even under the broader FLSA standard, the proper application of the rule to the factual situation in each case. The County of Sonoma case set out the factors which must be considered in determining whether restrictions placed on employees during on-call hours were so extensive that such time should be deemed "hours worked" under the Fair Labor Standards Act (FLSA). According to the Court, those factors include: (1) whether there are excessive geographical restrictions on employees' movements; (2) whether the frequency of calls is unduly restrictive; (3) whether a required response time is unduly restrictive; (4) whether the on-call employee can easily trade his or her on-call responsibilities with another employee, and (6) the extent of personal activities engaged in during on-call time. (O.L. 1998.12.28)

47.5.5.2    Moreover, as with the test under the FLSA, the DLSE looks to "[w]hether time is spent predominantly for the employer's benefit or for the employee's"...This is a question 'dependent upon all the circumstances of the case.' Id. In other words, the facts may show that the employee was 'engaged to wait' or 'waited to be engaged.' This is a highly fact-driven test." (Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers, 971 F.2d 347, 354 (9th Cir.1992)

47.5.6    Except for employees in the "Health Care industry", while the Division cannot utilize the federal test in its entirety because of the obvious differences in the statute, the test applied under the California law is also "highly fact-driven." The difference is that the California test places no reliance on whether the individual is engaged in "work" and, thus, the existence of an "agreement" regarding the understanding of the parties is of no importance. The ultimate consideration in applying the California law is determining the extent of the "control" exercised.

47.5.6.1    The Division does not take the position that simply requiring the worker to respond to call backs is so inherently intrusive as to require a finding that the worker is under the control of the employer. Such factors as (1) geographical restrictions on employees' movements; (2) required response time; (3) the nature of the employment; and, (4) the extent the employer's policy would impact on personal activities during on-call time, must all be considered. The bottom-line consideration is the amount of "control" exercised by the employer over the activities of the worker. In some employments, the employer can be said to be exercising some limited control over his employee at all times. For instance, by statute the employee must give preference to the business of his employer if it is similar to the personal business he transacts. (Labor Code §2863). However, immediate control by the employer which is for the direct benefit of the employer must be compensated. (O.L. 1993.03.31, 1992.01.28)

DIVISION OF LABOR STANDARDS ENFORCEMENT
ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

47.6       Hours Worked — Unscheduled Overtime.

47.6.1     The California Industrial Welfare Commission Orders generally provide that "hours worked" means "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

47.6.2     Employer's Reasonable Duty to Ascertain. The courts have found that if employer had "constructive" knowledge of the fact that employees are working overtime, the wages must be paid. (Brennan v. GMAC (5th Cir.1973) 482 F.2d 825; see also, Burry v. National Trailer (6th Cir.1964) 338 F.2d 422; Kappler v. Republic Pictures (S.D. Iowa, 1945) 59 F.Supp. 112 [duty to inquire regarding overtime, employer may not escape duty by delegating].

47.6.3     Employee's Duty to Disclose . Forrester v. Roth, 646 F.2d 413 (9th Cir.1981). This case holds that "suffer or permit" means work the employer knew or should have known of. But, if employee deliberately prevents the employer from obtaining knowledge of overtime worked, the employee cannot later claim recovery.   The employer must have the opportunity to obey the law. (See also, Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th 785, 802, concerning requirement that exempt employee has duty to meet employer's "realistic expectations" concerning duties.)

47.6.4     It must be noted, as the IWC stated in the Statement As To The Basis of the Wage Orders, that the Supreme Court in Ramirez stated that in determining realistic expectations, consideration must be given to "whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's...performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." In other words, an employer may not choose to ignore the fact that it would not be reasonable to expect an employee to perform the duties assigned without working overtime.

47.7       All Hours Must Be Compensated Regardless Of Method Used In Computation. DLSE has opined that employees must be paid at least the minimum wage for all hours they are employed.  Consequently, if, as a result of the directions of the employer, the compensation received by piece rate or commissioned workers is reduced because they are precluded, by such directions of the employer, from earning either commissions or piece rate compensation during a period of time, the employee must be paid at least the minimum wage (or contract hourly rate if one exists) for the period of time the employee's opportunity to earn commissions or piece rate.

47.7.1     As an example, if piece rate workers are required to attend a meeting during which, of course, they would not be able to earn compensation at the piece rate, the employer would be required to pay those workers at least the minimum wage (or the contract hourly wage, if one exists) during such period. (For discussion of the legal rationale underlying this enforcement policy, see O.L. 2002.01.29)

# EXHIBIT C

Senate Bill No. 435

CHAPTER 719

An act to amend Section 226.7 of the Labor Code, relating to compensation.

[Approved by Governor October 10, 2013. Filed with
Secretary of State October 10, 2013.]

LEGISLATIVE COUNSEL'S DIGEST

SB 435, Padilla. Compensation: meal and rest or recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period.

This bill would make that prohibition applicable to a meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. The bill would exempt specified employees from the prohibition. The bill would require an employer to pay an employee, for any meal or rest or recovery period mandated by law, one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided. The bill would define "recovery period" for those purposes.

*The people of the State of California do enact as follows:*

SECTION 1. Section 226.7 of the Labor Code is amended to read:

226.7. (a) As used in this section, "recovery period" means a cooldown period afforded an employee to prevent heat illness.

(b) An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health.

(c) If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, including, but not limited to, an applicable statute or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided.

94

Ch. 719 — 2 —

(d) This section shall not apply to an employee who is exempt from meal or rest or recovery period requirements pursuant to other state laws, including, but not limited to, a statute or regulation, standard, or order of the Industrial Welfare Commission.

O

Senate Bill No. 435

———

Passed the Senate  September 6, 2013

_____

*Secretary of the Senate*

———

Passed the Assembly  September 4, 2013

_____

*Chief Clerk of the Assembly*

———

This bill was received by the Governor this _____ day

of _____, 2013, at _____ o'clock ____M.

_____

*Private Secretary of the Governor*

SB 435                          — 2 —

CHAPTER _____

An act to amend Section 226.7 of the Labor Code, relating to compensation.

LEGISLATIVE COUNSEL'S DIGEST

SB 435, Padilla. Compensation: meal and rest or recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period.

This bill would make that prohibition applicable to a meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. The bill would exempt specified employees from the prohibition. The bill would require an employer to pay an employee, for any meal or rest or recovery period mandated by law, one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided. The bill would define "recovery period" for those purposes.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 226.7 of the Labor Code is amended to read:

226.7.  (a)  As used in this section, "recovery period" means a cooldown period afforded an employee to prevent heat illness.

(b)  An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health.

(c)  If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, including, but

95

— 3 —                    SB 435

not limited to, an applicable statute or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided.

(d) This section shall not apply to an employee who is exempt from meal or rest or recovery period requirements pursuant to other state laws, including, but not limited to, a statute or regulation, standard, or order of the Industrial Welfare Commission.

Approved _____, 2013


_____
                                    *Governor*

AMENDED IN ASSEMBLY AUGUST 22, 2013

AMENDED IN ASSEMBLY AUGUST 5, 2013

AMENDED IN SENATE APRIL 16, 2013

## SENATE BILL                                        No. 435

### Introduced by Senator Padilla

February 21, 2013

An act to amend Section 226.7 of the Labor Code, relating to compensation.

LEGISLATIVE COUNSEL'S DIGEST

SB 435, as amended, Padilla. Compensation: meal and rest ~~and~~ *or* recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period.

This bill would make that prohibition applicable to ~~any~~ *a* meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. *The bill would exempt specified employees from the prohibition.* The bill would require an employer to pay an employee, for any meal or rest or recovery period mandated by law, one additional hour of pay at the employee's regular rate of compensation for each ~~work day~~ *workday* that the meal or rest or recovery period is not provided. The bill would define "recovery period" for those purposes.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

SB 435                    — 2 —

*The people of the State of California do enact as follows:*

1    SECTION 1.   Section 226.7 of the Labor Code is amended to
2    read:
3    226.7.   (a)   As used in this section, "recovery period" means a
4    cooldown period afforded an employee to prevent heat illness.
5    (b)   An employer shall not require ~~any~~ *an* employee to work
6    during ~~any~~ *a* meal or rest or recovery period mandated pursuant
7    to ~~any~~ *an* applicable statute, or applicable regulation, standard, or
8    order of the Industrial Welfare Commission, the Occupational
9    Safety and Health Standards Board, or the Division of Occupational
10   Safety and Health.
11   (c)   If an employer fails to provide an employee a meal or rest
12   or recovery period in accordance with ~~any~~ *a* state law, including,
13   but not limited to, ~~any~~ *an* applicable statute or applicable
14   regulation, standard, or order of the Industrial Welfare
15   Commission, the Occupational Safety and Health Standards Board,
16   or the Division of Occupational Safety and Health, the employer
17   shall pay the employee one additional hour of pay at the
18   employee's regular rate of compensation for each workday that
19   the meal or rest or recovery period is not provided.
20   *(d)   This section shall not apply to an employee who is exempt*
21   *from meal or rest or recovery period requirements pursuant to*
22   *other state laws, including, but not limited to, a statute or*
23   *regulation, standard, or order of the Industrial Welfare*
24   *Commission.*

O

AMENDED IN ASSEMBLY AUGUST 5, 2013

AMENDED IN SENATE APRIL 16, 2013

## SENATE BILL                                    No. 435

### Introduced by Senator Padilla

### February 21, 2013

An act to amend Section 226.7 of the Labor Code, relating to compensation.

LEGISLATIVE COUNSEL'S DIGEST

SB 435, as amended, Padilla. Compensation:~~piece-rate workers:~~ *meal and* rest and recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period. ~~Existing law establishes the Division of Labor Standards Enforcement (DLSE) in the Department of Industrial Relations for the enforcement of labor laws, including wage claims.~~

This bill would make that prohibition applicable to any meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. The bill would require ~~employers~~ *an employer* to pay ~~employees~~ *an employee,* for any *meal or* rest *or recovery* period mandated by law, ~~including any applicable statute or applicable regulation, standard, or order of the IWC, the board, or the Division of Occupational Safety and Health, that is not provided. The bill would require the rate of pay for the rest and recovery periods of piece-rate workers to be the average piece-rate wage, as specified. The bill would authorize a piece-rate~~

97

SB 435                    — 2 —

~~worker, pursuant to a civil action or a claim filed with DLSE, to recover
his or her unpaid average piece-rate wage for each rest or recovery
period in which a violation of these provisions occurred. The bill would
provide that it does not apply to an employee whose wages, hours, and
working conditions are covered by a collective bargaining agreement
that expressly addresses rest or recovery periods for employees paid on
a piece-rate basis, or to employees exempt under specified law.~~ *one
additional hour of pay at the employee's regular rate of compensation
for each work day that the meal or rest or recovery period is not
provided. The bill would define "recovery period" for those purposes.*

   Vote: majority. Appropriation: no. Fiscal committee: yes.
State-mandated local program: no.

   *The people of the State of California do enact as follows:*

1  SECTION 1.  Section 226.7 of the Labor Code is amended to
2  read:
3  226.7.  (a)  As used in this ~~section:~~ *section, "recovery period"*
4  *means a cooldown period afforded an employee to prevent heat*
5  *illness.*
6  ~~(1) "Piece-rate basis" means a method of payment based on~~
7  ~~units of production earned by an employee during a work day or~~
8  ~~a pay period, or any fraction thereof.~~
9  ~~(2) "Recovery period" means a cooldown period afforded an~~
10 ~~employee to prevent heat illness.~~
11 ~~(3) "Unit of production" means any measurable or quantifiable~~
12 ~~employee activity that can be assigned a monetary value for~~
13 ~~purposes of computing pay for activity performed by the employee~~
14 ~~during a work day or pay period or fraction thereof.~~
15  (b)  An employer shall not require any employee to work during
16  any meal or rest or recovery period mandated pursuant to any
17  applicable statute, or applicable regulation, standard, or order of
18  the Industrial Welfare Commission, the Occupational Safety and
19  Health Standards Board, or the Division of Occupational Safety
20  and Health.
21  (c)  If an employer fails to provide an employee a meal ~~period~~
22  or rest *or recovery* period in accordance with any state law,
23  including, but not limited to, any applicable statute or applicable
24  regulation, standard, or order of the Industrial Welfare
25  Commission, the Occupational Safety and Health Standards Board,

— 3 —                    SB 435

1  or the Division of Occupational Safety and Health, the employer
2  shall pay the employee one additional hour of pay at the
3  employee's regular rate of compensation for each workday that
4  the meal or rest or recovery period is not provided.
5  (d) (1) Rest or recovery periods mandated pursuant to any state
6  law, including, but not limited to, a statute, or a regulation,
7  standard, or order of the Industrial Welfare Commission, the
8  Occupational Safety and Health Standards Board, or the Division
9  of Occupational Safety and Health, shall be counted as hours
10  worked for which there shall be no deduction from wages. An
11  employee working on a piece-rate basis shall be compensated for
12  rest periods by being paid his or her average piece-rate wage during
13  each pay period, or portion of a pay period, in which the employee
14  was paid on a piece-rate basis.
15  (2) Pursuant to a civil action or a claim filed with the Division
16  of Labor Standards Enforcement, an employee working on a
17  piece-rate basis may recover his or her unpaid average piece-rate
18  wage for each rest or recovery period in any pay period in which
19  a violation of this subdivision occurred in addition to any amounts
20  owed pursuant to subdivision (c).
21  (e) This section does not apply to an employee whose wages,
22  hours, and working conditions are covered by a collective
23  bargaining agreement that expressly addresses rest or recovery
24  periods for employees paid on a piece-rate basis.
25  (f) This section does not apply to an employee who is exempt
26  pursuant to any state law, including, but not limited to, a statute
27  or a regulation, standard, or order of the Industrial Welfare
28  Commission.

O

AMENDED IN SENATE APRIL 16, 2013

SENATE BILL                                  No. 435

Introduced by Senator Padilla

February 21, 2013

An act to amend Section 226.7 of the Labor Code, relating to compensation.

LEGISLATIVE COUNSEL'S DIGEST

SB 435, as amended, Padilla. Compensation: piece-rate workers: rest and recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period. Existing law establishes the Division of Labor Standards Enforcement (DLSE) in the Department of Industrial Relations for the enforcement of labor laws, including wage claims.

This bill would make that prohibition applicable to any meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. The bill would require employers to pay employees for any rest period mandated by law, including any applicable statute or applicable regulation, standard, or order of the IWC, the board, or the Division of Occupational Safety and Health, that is not provided. The bill would require the rate of pay for the rest and recovery periods of piece-rate workers to be the average piece-rate wage, as specified. The bill would authorize a piece-rate worker, pursuant to a civil action or a claim filed with DLSE, to recover his or her unpaid average piece-rate wage for

98

SB 435                    — 2 —

each rest or recovery period in which a violation of these provisions occurred. The bill would provide that it does not apply to an employee whose wages, hours, and working conditions are covered by a collective bargaining agreement that expressly addresses rest or recovery periods for employees paid on a piece-rate basis, *or to employees exempt under specified law.*

Vote: majority.  Appropriation:  no.  Fiscal committee:  yes. State-mandated local program:  no.

*The people of the State of California do enact as follows:*

1    SECTION 1.  Section 226.7 of the Labor Code is amended to
2  read:
3    226.7.  (a)  As used in this ~~section, "piece-rate~~ *section:*
4    *(1)  "Piece-rate* basis" means a method of payment based on
5  units of production earned by an employee during a work day or
6  a pay period, or any fraction thereof. ~~"Unit~~
7    *(2)  "Recovery period" means a cooldown period afforded an*
8  *employee to prevent heat illness.*
9    *(3)  "Unit* of production" means any measurable or quantifiable
10  employee activity that can be assigned a monetary value for
11  purposes of computing pay for activity performed by the employee
12  during a work day or pay period or fraction thereof.
13    (b)  An employer shall not require any employee to work during
14  any meal or rest or recovery period mandated pursuant to any
15  applicable statute, or applicable regulation, standard, or order of
16  the Industrial Welfare Commission, the Occupational Safety and
17  Health Standards Board, or the Division of Occupational Safety
18  and Health.
19    (c)  If an employer fails to provide an employee a meal period
20  or rest period in accordance with any state law, including, but not
21  limited to, any applicable statute or applicable regulation, standard,
22  or order of the Industrial Welfare Commission, the Occupational
23  Safety and Health Standards Board, or the Division of Occupational
24  Safety and Health, the employer shall pay the employee one
25  additional hour of pay at the employee's regular rate of
26  compensation for each work day that the meal or rest or recovery
27  period is not provided.
28    (d)  (1)  Rest or recovery periods mandated pursuant to any state
29  law, including, but not limited to, *a* statute, or *a* regulation,

98

1  standard, or order of the Industrial Welfare Commission, the
2  Occupational Safety and Health Standards Board, or the Division
3  of Occupational Safety and Health, shall be counted as hours
4  worked for which there shall be no deduction from wages. An
5  employee working on a piece-rate basis shall be compensated for
6  rest periods by being paid his or her average piece-rate wage during
7  each pay period, or portion of a pay period, in which the employee
8  was paid on a piece-rate basis.
9      (2) Pursuant to a civil action or a claim filed with the Division
10  of Labor Standards Enforcement, an employee working on a
11  piece-rate basis may recover his or her unpaid average piece-rate
12  wage for each rest or recovery period in any pay period in which
13  a violation of this subdivision occurred in addition to any amounts
14  owed pursuant to subdivision (c).
15     (e) This section does not apply to an employee whose wages,
16  hours, and working conditions are covered by a collective
17  bargaining agreement that expressly addresses rest or recovery
18  periods for employees paid on a piece-rate basis.
19     *(f) This section does not apply to an employee who is exempt*
20  *pursuant to any state law, including, but not limited to, a statute*
21  *or a regulation, standard, or order of the Industrial Welfare*
22  *Commission.*

O

SENATE BILL                              No. 435

Introduced by Senator Padilla

February 21, 2013

An act to amend Section 226.7 of the Labor Code, relating to compensation.

LEGISLATIVE COUNSEL'S DIGEST

SB 435, as introduced, Padilla. Compensation: piece-rate workers: rest and recovery periods.

Existing law prohibits an employer from requiring an employee to work during any meal or rest period mandated by an order of the Industrial Welfare Commission (IWC) and establishes penalties for an employer's failure to provide a mandated meal or rest period. Existing law establishes the Division of Labor Standards Enforcement (DLSE) in the Department of Industrial Relations for the enforcement of labor laws, including wage claims.

This bill would make that prohibition applicable to any meal or rest or recovery period mandated by applicable statute or applicable regulation, standard, or order of the IWC, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health. The bill would require employers to pay employees for any rest period mandated by law, including any applicable statute or applicable regulation, standard, or order of the IWC, the board, or the Division of Occupational Safety and Health, that is not provided. The bill would require the rate of pay for the rest and recovery periods of piece-rate workers to be the average piece-rate wage, as specified. The bill would authorize a piece-rate worker, pursuant to a civil action or a claim filed with DLSE, to recover his or her unpaid average piece-rate wage for each rest or recovery period in which a violation of these provisions occurred. The bill would provide that it does not apply to an employee

99

SB 435                    — 2 —

whose wages, hours, and working conditions are covered by a collective bargaining agreement that expressly addresses rest or recovery periods for employees paid on a piece-rate basis.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

1   SECTION 1.  Section 226.7 of the Labor Code is amended to
2   read:
3   226.7.  (a)  ~~No~~ *As used in this section, "piece-rate basis" means*
4   *a method of payment based on units of production earned by an*
5   *employee during a work day or a pay period, or any fraction*
6   *thereof. "Unit of production" means any measurable or*
7   *quantifiable employee activity that can be assigned a monetary*
8   *value for purposes of computing pay for activity performed by the*
9   *employee during a work day or pay period or fraction thereof.*
10  *(b)  An* employer shall *not* require any employee to work during
11  any meal or rest *or recovery* period mandated ~~by an~~ *pursuant to*
12  *any* applicable *statute, or applicable regulation, standard, or* order
13  of the Industrial Welfare Commission, *the Occupational Safety*
14  *and Health Standards Board, or the Division of Occupational*
15  *Safety and Health.*
16  ~~(b)~~
17  *(c)*  If an employer fails to provide an employee a meal period
18  or rest period in accordance with ~~an~~ *any state law, including, but*
19  *not limited to,* any applicable *statute or applicable regulation,*
20  *standard, or* order of the Industrial Welfare Commission, *the*
21  *Occupational Safety and Health Standards Board, or the Division*
22  *of Occupational Safety and Health,* the employer shall pay the
23  employee one additional hour of pay at the employee's regular
24  rate of compensation for each work day that the meal or rest *or*
25  *recovery* period is not provided.
26  *(d)  (1)  Rest or recovery periods mandated pursuant to any state*
27  *law, including but not limited to, statute, or regulation, standard,*
28  *or order of the Industrial Welfare Commission, the Occupational*
29  *Safety and Health Standards Board, or the Division of*
30  *Occupational Safety and Health, shall be counted as hours worked*
31  *for which there shall be no deduction from wages. An employee*
32  *working on a piece-rate basis shall be compensated for rest periods*

1   *by being paid his or her average piece-rate wage during each pay*
2   *period, or portion of a pay period, in which the employee was paid*
3   *on a piece-rate basis.*
4     *(2) Pursuant to a civil action or a claim filed with the Division*
5   *of Labor Standards Enforcement, an employee working on a*
6   *piece-rate basis may recover his or her unpaid average piece-rate*
7   *wage for each rest or recovery period in any pay period in which*
8   *a violation of this subdivision occurred in addition to any amounts*
9   *owed pursuant to subdivision (c).*
10    *(e) This section does not apply to an employee whose wages,*
11   *hours, and working conditions are covered by a collective*
12   *bargaining agreement that expressly addresses rest or recovery*
13   *periods for employees paid on a piece-rate basis.*

O

# EXHIBIT D



# OFFICIAL NOTICE

### INDUSTRIAL WELFARE COMMISSION
### ORDER NO. 9-2001
### REGULATING
### WAGES, HOURS AND WORKING CONDITIONS IN THE

# TRANSPORTATION INDUSTRY

*Effective July 1, 2002 as amended*

*Sections 4(A) and 10(C) amended and republished by the Department of Industrial Relations, effective July 1, 2014, pursuant to AB 10, Chapter 351, Statutes of 2013 and AB 1835, Chapter 230, Statutes of 2006*

*This Order Must Be Posted Where Employees Can Read It Easily*

IWC FORM 1109 (Rev. 07-2014)
    OSP 06 98767

● **Please Post With This Side Showing** ●

## OFFICIAL NOTICE

*Effective July 1, 2002 as amended*

*Sections 4(A) and 10(C) amended and republished by the Department of Industrial Relations, effective July 1, 2014 pursuant to AB 10, Chapter 351, Statutes of 2013 and AB 1835, Chapter 230, Statutes of 2006*



### INDUSTRIAL WELFARE COMMISSION
### ORDER NO. 9-2001
### REGULATING
### WAGES, HOURS AND WORKING CONDITIONS IN THE

# TRANSPORTATION INDUSTRY

**TAKE NOTICE:** To employers and representatives of persons working in industries and occupations in the State of California: The Department of Industrial Relations amends and republishes the minimum wage and meals and lodging credits in the Industrial Welfare Commission's Orders as a result of legislation enacted (AB 10, Ch. 351, Stats of 2013, amending section 1182.12 of the California Labor Code, and AB 1835, Ch. 230, Stats of 2006, adding sections 1182.12 and 1182.13 to the California Labor Code .) The amendments and republishing make no other changes to the IWC's Orders.

## 1. APPLICABILITY OF ORDER

This order shall apply to all persons employed in the transportation industry whether paid on a time, piece rate, commission, or other basis, except that:

(A) Provisions of Sections 3 through 12 of this order shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption from those sections:

(1) <u>Executive Exemption.</u> A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(2) <u>Administrative Exemption.</u> A person employed in an administrative capacity means any employee:

(a) Whose duties and responsibilities involve either:

(i) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his/her employer's customers; or

(ii) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

—1

(3) Professional Exemption. A person employed in a professional capacity means any employee who meets all of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:

(i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or

(ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and

(iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515 (c) as 40 hours per week.

(e) Subparagraph (b) above is intended to be construed in accordance with the following provisions of federal law as they existed as of the date of this wage order: 29 C.F.R. Sections 541.207, 541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.

(f) Notwithstanding the provisions of this subparagraph, pharmacists employed to engage in the practice of pharmacy, and registered nurses employed to engage in the practice of nursing, shall not be considered exempt professional employees, nor shall they be considered exempt from coverage for the purposes of this subparagraph unless they individually meet the criteria established for exemption as executive or administrative employees.

(g) Subparagraph (f) above shall not apply to the following advanced practice nurses:

(i) Certified nurse midwives who are primarily engaged in performing duties for which certification is required pursuant to Article 2.5 (commencing with Section 2746) of Chapter 6 of Division 2 of the Business and Professions Code.

(ii) Certified nurse anesthetists who are primarily engaged in performing duties for which certification is required pursuant to Article 7 (commencing with Section 2825) of Chapter 6 of Division 2 of the Business and Professions Code.

(iii) Certified nurse practitioners who are primarily engaged in performing duties for which certification is required pursuant to Article 8 (commencing with Section 2834) of Chapter 6 of Division 2 of the Business and Professions Code.

(iv) Nothing in this subparagraph shall exempt the occupations set forth in clauses (i), (ii), and (iii) from meeting the requirements of subsection 1(A)(3)(a)-(d) above.

(h) Except, as provided in subparagraph (i), an employee in the computer software field who is paid on an hourly basis shall be exempt, if *all* of the following apply:

(i) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.

(ii) The employee is primarily engaged in duties that consist of one or more of the following:

—The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.

—The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

—The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(iii) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering. A job title shall not be determinative of the applicability of this exemption.

(iv) The employee's hourly rate of pay is not less than forty-one dollars ($41.00). The Office of Policy, Research and Legislation shall adjust this pay rate on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.*

(i) The exemption provided in subparagraph (h) does not apply to an employee if *any* of the following apply:

(i) The employee is a trainee or employee in an entry-level position who is learning to become proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering.

(ii) The employee is in a computer-related occupation but has not attained the level of skill and expertise necessary to work independently and without close supervision.

(iii) The employee is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment.

---

* Pursuant to Labor Code section 515.5, subdivision (a)(4), the Office of Policy, Research and Legislation, Department of Industrial Relations, has adjusted the minimum hourly rate of pay specified in this subdivision to be $49.77, effective January 1, 2007. This hourly rate of pay is adjusted on October 1 of each year to be effective on January 1, of the following year, and may be obtained at www.dir.ca.gov/IWC or by mail from the Department of Industrial Relations.

(iv) The employee is an engineer, drafter, machinist, or other professional whose work is highly dependent upon or facilitated by the use of computers and computer software programs and who is skilled in computer-aided design software, including CAD/CAM, but who is not in a computer systems analysis or programming occupation.

(v) The employee is a writer engaged in writing material, including box labels, product descriptions, documentation, promotional material, setup and installation instructions, and other similar written information, either for print or for on screen media or who writes or provides content material intended to be read by customers, subscribers, or visitors to computer-related media such as the World Wide Web or CD-ROMs.

(vi) The employee is engaged in any of the activities set forth in subparagraph (h) for the purpose of creating imagery for effects used in the motion picture, television, or theatrical industry.

(B) Except as provided in Sections 1, 2, 4, 10, and 20, and with regard to commercial drivers, Sections 11 and 12, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district. The application of Sections 11 and 12 for commercial drivers employed by governmental entities shall become effective July 1, 2004 or following the expiration date of any valid collective bargaining agreement applicable to such commercial drivers then in effect but, in any event, no later than August 1, 2005. Notwithstanding Section 21, the application of Sections 11 or 12 to public transit bus drivers shall be null and void in the event the IWC or any court of competent jurisdiction invalidates the collective bargaining exemption established by Sections 11 or 12 for those drivers.

(C) The provisions of this order shall not apply to outside salespersons.

(D) The provisions of this order shall not apply to any individual who is the parent, spouse, child, or legally adopted child of the employer.

(E) Except as provided in Sections 4, 10, 11, 12, and 20 through 22, this order shall not be deemed to cover those employees who have entered into a collective bargaining agreement under and in accordance with the provisions of the Railway Labor Act, 45 U.S.C. Sections 151 et seq.

(F) The provisions of this Order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending Labor Code § 1171.)

## 2. DEFINITIONS

(A) An "alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period.

(B) "Commission" means the Industrial Welfare Commission of the State of California.

(C) "Commercial driver" means an employee who operates a vehicle described in subdivision (b) of Section 15210 of the Vehicle Code.

(D) "Division" means the Division of Labor Standards Enforcement of the State of California.

(E) "Employ" means to engage, suffer, or permit to work.

(F) "Employee" means any person employed by an employer.

(G) "Employer" means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

(H) "Hours worked" means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.

(I) "Minor" means, for the purpose of this order, any person under the age of 18 years.

(J) "Outside salesperson" means any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

(K) "Primarily" as used in Section 1, Applicability, means more than one-half the employee's work time.

(L) "Public Transit Bus Driver" means a commercial driver who operates a transit bus and is employed by a governmental entity.

(M) "Shift" means designated hours of work by an employee, with a designated beginning time and quitting time.

(N) "Split shift" means a work schedule, which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods.

(O) "Teaching" means, for the purpose of Section 1 of this order, the profession of teaching under a certificate from the Commission for Teacher Preparation and Licensing or teaching in an accredited college or university.

(P) "Transportation Industry" means any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles.

(Q) "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

(R) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day.

(S) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods.

## 3. HOURS AND DAYS OF WORK

(A) Daily Overtime-General Provisions

(1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half ($1\frac{1}{2}$) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek.

—3—

Eight (8) hours of labor constitutes a day's work and employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

(a) One and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

(c) The overtime rate of compensation required to be paid to a nonexempt full-time salaried employee shall be computed by using the employee's regular hourly salary as one-fortieth (1/40) of the employee's weekly salary.

(B) Alternative Workweek Schedules

(1) No employer shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order, a regularly scheduled alternative workweek schedule of not more than ten (10) hours per day within a 40 hour workweek without the payment of an overtime rate of compensation. All work performed in any workday beyond the schedule established by the agreement up to 12 hours a day or beyond 40 hours per week shall be paid at one and one-half (1½) times the employee's regular rate of pay. All work performed in excess of 12 hours per day and any work in excess of eight (8) hours on those days worked beyond the regularly scheduled number of workdays established by the alternative workweek agreement shall be paid at double the employee's regular rate of pay. Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift. Nothing in this section shall prohibit an employer, at the request of the employee, to substitute one day of work for another day of the same length in the shift provided by the alternative workweek agreement on an occasional basis to meet the personal needs of the employee without the payment of overtime. No hours paid at either one and one-half (1½) or double the regular rate of pay shall be included in determining when 40 hours have been worked for the purpose of computing overtime compensation.

(2) If an employer whose employees have adopted an alternative workweek agreement permitted by this order requires an employee to work fewer hours than those that are regularly scheduled by the agreement, the employer shall pay the employee overtime compensation at a rate of one and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours, and double the employee's regular rate of pay for all hours worked in excess of 12 hours for the day the employee is required to work the reduced hours.

(3) An employer shall not reduce an employee's regular rate of hourly pay as a result of the adoption, repeal or nullification of an alternative workweek schedule.

(4) An employer shall explore any available reasonable alternative means of accommodating the religious belief or observance of an affected employee that conflicts with an adopted alternative workweek schedule, in the manner provided by subdivision(j) of Section 12940 of the Government Code.

(5) An employer shall make a reasonable effort to find a work schedule not to exceed eight (8) hours in a workday, in order to accommodate any affected employee who was eligible to vote in an election authorized by this section and who is unable to work the alternative workweek schedule established as the result of that election.

(6) An employer shall be permitted, but not required, to provide a work schedule not to exceed eight (8) hours in a workday to accommodate any employee who is hired after the date of the election and who is unable to work the alternative workweek schedule established by the election.

(7) Arrangements adopted in a secret ballot election held pursuant to this order prior to 1998, or under the rules in effect prior to 1998, and before the performance of the work, shall remain valid after July 1, 2000 provided that the results of the election are reported by the employer to the Office of Policy, Research and Legislation by January 1, 2001, in accordance with the requirements of subsection (C) below (Election Procedures). If an employee was voluntarily working an alternative workweek schedule of not more than ten (10) hours a day as of July 1, 1999, that alternative workweek schedule was based on an individual agreement made after January 1, 1998 between the employee and employer, and the employee submitted, and the employer approved, a written request on or before May 30, 2000 to continue the agreement, the employee may continue to work that alternative workweek schedule without payment of an overtime rate of compensation for the hours provided in the agreement. The employee may revoke his/her voluntary authorization to continue such a schedule with 30 days written notice to the employer. New arrangements can only be entered into pursuant to the provisions of this section.

(C) Election Procedures

Election procedures for the adoption and repeal of alternative workweek schedules require the following:

(1) Each proposal for an alternative workweek schedule shall be in the form of a written agreement proposed by the employer. The proposed agreement must designate a regularly scheduled alternative workweek in which the specified number of work days and work hours are regularly recurring. The actual days worked within that alternative workweek schedule need not be specified. The employer may propose a single work schedule that would become the standard schedule for workers in the work unit, or a menu of work schedule options, from which each employee in the unit would be entitled to choose. If the employer proposes a menu of work schedule options, the employee may, with the approval of the employer, move from one menu option to another.

(2) In order to be valid, the proposed alternative workweek schedule must be adopted in a secret ballot election, before the performance of work, by at least a two-thirds (2/3) vote of the affected employees in the work unit. The election shall be held during regular working hours at the employees' work site. For purposes of this subsection, "affected employees in the work unit" may include all employees in a readily identifiable work unit, such as a division, a department, a job classification, a shift, a separate physical location, or a recognized subdivision of any such work unit. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection are met.

(3) Prior to the secret ballot vote, any employer who proposed to institute an alternative workweek schedule shall have made a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits. Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects of the alternative workweek schedule. An employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer

—4

shall mail the ballots of such employees who are not present on the worksite. Failure to comply with this paragraph shall make the election null and void.

(4) Any election to establish or repeal an alternative workweek schedule shall be held at the work site of the affected employees. The employer shall bear the costs of conducting any election held pursuant to this section. Upon a complaint by an affected employee, and after an investigation by the labor commissioner, the labor commissioner may require the employer to select a neutral third party to conduct the election.

(5) Any type of alternative workweek schedule that is authorized by the California Labor Code may be repealed by the affected employees. Upon a petition of one-third (1/3) of the affected employees, a new secret ballot election shall be held and a two- thirds (2/3) vote of the affected employees shall be required to reverse the alternative workweek schedule. The election to repeal the alternative workweek schedule shall be held not more than 30 days after the petition is submitted to the employer, except that the election shall be held not less than 12 months after the date that the same group of employees voted in an election held to adopt or repeal an alternative workweek schedule. The election shall take place during regular working hours at the employees' work site. If the alternative workweek schedule is revoked, the employer shall comply within 60 days. Upon proper showing of undue hardship, the Division of Labor Standards Enforcement may grant an extension of time for compliance.

(6) Only secret ballots may be cast by affected employees in the work unit at any election held pursuant to this section. The results of any election conducted pursuant to this section shall be reported by the employer to the Office of Policy, Research and Legislation within 30 days after the results are final, and the report of election results shall be a public document. The report shall include the final tally of the vote, the size of the unit, and the nature of the business of the employer.

(7) Employees affected by a change in the work hours resulting from the adoption of an alternative workweek schedule may not be required to work those new work hours for at least 30 days after the announcement of the final results of the election.

(8) Employers shall not intimidate or coerce employees to vote either in support of or in opposition to a proposed alternative workweek. No employees shall be discharged or discriminated against for expressing opinions concerning the alternative workweek election or for opposing or supporting its adoption or repeal. However, nothing in this section shall prohibit an employer from expressing his/her position concerning that alternative workweek to the affected employees. A violation of this paragraph shall be subject to California Labor Code Section 98 et seq.

(D) One and one-half ($1^1/_2$) times a minor's regular rate of pay shall be paid for all work over 40 hours in any workweek except minors 16 or 17 years old who are not required by law to attend school and may therefore by employed for the same hours as an adult are subject to subsection (A) or (B) and (C) above.

(VIOLATIONS OF CHILD LABOR LAWS are subject to civil penalties of from $500 to $10,000 as well as to criminal penalties. Refer to California Labor Code Sections 1285 to 1312 and 1390 to 1399 for additional restrictions on the employment of minors and for descriptions of criminal and civil penalties for violation of the child labor laws. Employers should ask school districts about any required work permits.)

(E) An employee may be employed on seven (7) workdays in one workweek when the total hours of employment during such workweek do not exceed 30 and the total hours of employment in any one workday thereof do not exceed six (6).

(F) If a meal period occurs on a shift beginning or ending at or between the hours of 10 p.m. and 6 a.m., facilities shall be available for securing hot food and drink or for heating food or drink, and a suitable sheltered place shall be provided in which to consume such food or drink.

(G) The provisions of Labor Code Sections 551 and 552 regarding one (1) day's rest in seven (7) shall not be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires the employee to work seven (7) or more consecutive days; provided, however, that in each calendar month, the employee shall receive the equivalent of one (1) day's rest in seven (7).

(H) Except as provided in subsections (E) and (G), this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

(I) Notwithstanding subsection (H) above, where the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pertaining to the hours of work of the employees, the requirement regarding the equivalent of one (1) day's rest in seven (7) (see subsection (G) above) shall apply, unless the agreement expressly provides otherwise.

(J) If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek in which the work time was lost, may not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 11 hours of work in one (1) day or 40 hours of work in one (1) workweek. If an employee knows in advance that he/she will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to make up work time for up to four (4) weeks in advance; provided, however, that the makeup work must be performed in the same week that the work time was lost. An employee shall provide a signed written request for each occasion that the employee makes a request to make up work time pursuant to this subsection. While an employer may inform an employee of this makeup time option, the employer is prohibited from encouraging or otherwise soliciting an employee to request the employer's approval to take personal time off and make up the work hours within the same workweek pursuant to this subsection.

(K) The daily overtime provision of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for 24-hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one (1) hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule.

(L) The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) The United States Department of Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13, Hours of Service of Drivers, or;

—5

(2) Requiring or permitting in any manner or under any conditions or circumstances the employing hours of drivers.

(M) The provisions of this section shall not apply to taxicab drivers.

(N) The provisions of this section shall not apply where any employee of an airline certified by the federal or state government works over 40 hours but not more than 60 hours in a workweek due to a temporary modification in the employee's normal work schedule not required by the employer but arranged at the request of the employee, including but not limited to situations where the employee requests a change in days off or trades days off with another employee.

## 4. MINIMUM WAGES

(A) Every employer shall pay to each employee wages not less than nine dollars ($9.00) per hour for all hours worked, effective July 1, 2014, and not less than ten dollars ($10.00) per hour for all hours worked, effective January 1, 2016, except:

LEARNERS: Employees during their first 160 hours of employment in occupations in which they have no previous similar or related experience, may be paid not less than 85 percent of the minimum wage rounded to the nearest nickel.

(B) Every employer shall pay to each employee, on the established payday for the period worked, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

(C) When an employee works a split shift, one (1) hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment.

(D) The provisions of this section shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

## 5. REPORTING TIME PAY

(A) Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B) If an employee is required to report for work a second time in any one workday and is furnished less than two (2) hours of work on the second reporting, said employee shall be paid for two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

(C) The foregoing reporting time pay provisions are not applicable when:

(1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or

(2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or

(3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time.

## 6. LICENSES FOR DISABLED WORKERS

(A) A license may be issued by the Division authorizing employment of a person whose earning capacity is impaired by physical disability or mental deficiency at less than the minimum wage. Such licenses shall be granted only upon joint application of employer and employee and employee's representative if any.

(B) A special license may be issued to a nonprofit organization such as a sheltered workshop or rehabilitation facility fixing special minimum rates to enable the employment of such persons without requiring individual licenses of such employees.

(C) All such licenses and special licenses shall be renewed on a yearly basis or more frequently at the discretion of the Division.

(See California Labor Code, Sections 1191 and 1191.5)

## 7. RECORDS

(A) Every employer shall keep accurate information with respect to each employee including the following:

(1) Full name, home address, occupation and social security number.

(2) Birth date, if under 18 years, and designation as a minor.

(3) Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. Meal periods during which operations cease and authorized rest periods need not be recorded.

(4) Total wages paid each payroll period, including value of board, lodging, or other compensation actually furnished to the employee.

(5) Total hours worked in the payroll period and applicable rates of pay. This information shall be made readily available to the employee upon reasonable request.

(6) When a piece rate or incentive plan is in operation, piece rates or an explanation of the incentive plan formula shall be provided to employees. An accurate production record shall be maintained by the employer.

(B) Every employer shall semimonthly or at the time of each payment of wages furnish each employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately, an itemized statement in writing showing: (1) all deductions; (2) the inclusive dates of the period for which the employee is paid; (3) the name of the employee or the employee's social security number; and (4) the name of the employer, provided all deductions made on written orders of the employee may be aggregated and shown as one item.

—6

(C) All time records shall be in English and ink or an indelible form, properly dated, showing month, day and year, and shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. An employee's records shall be available for inspection by the employee upon reasonable request.

(D) Clocks shall be provided in all major work areas or within a reasonable distance thereto insofar as practicable.

## 8. CASH SHORTAGE AND BREAKAGE

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

## 9. UNIFORMS AND EQUIPMENT

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color.

**NOTE:** This section shall not apply to protective apparel regulated by the Occupational Safety and Health Standards Board.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

**NOTE:** This section shall not apply to protective equipment and safety devices on tools regulated by the Occupational Safety and Health Standards Board.

(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsections (A) and (B) of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) and (B) above in the event said item is not returned. No deduction shall be made at any time for normal wear and tear. All items furnished by the employer shall be returned by the employee upon completion of the job.

## 10. MEALS AND LODGING

(A) "Meal" means an adequate, well-balanced serving of a variety of wholesome, nutritious foods.

(B) "Lodging" means living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed.

(C) Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee. When credit for meals or lodging is used to meet part of the employer's minimum wage obligation, the amounts so credited may not be more than the following:

| LODGING | Effective<br>July 1, 2014 | Effective<br>January 1, 2016 |
|---|---|---|
| Room occupied alone……………………………… | $42.33 per week | $47.03 per week |
| Room shared…………………………………… | $34.94 per week | $38.82 per week |
| Apartment – two thirds (2/3) of the ordinary rental value, and in no event more than:…………………… | $508.38 per month | $564.81 per month |
| Where a couple are both employed by the employer, two thirds (2/3) of the ordinary rental value, and in no event more than: | $752.02 per month | $835.49 per month |
| MEALS | | |
| Breakfast……………………………………………… | $3.26 | $3.62 |
| Lunch……………………………………………….... | $4.47 | $4.97 |
| Dinner…………………………………………………. | $6.01 | $6.68 |

(D) Meals evaluated as part of the minimum wage must be bona fide meals consistent with the employee's work shift. Deductions shall not be made for meals not received or lodging not used.

(E) If, as a condition of employment, the employee must live at the place of employment or occupy quarters owned or under the control of the employer, then the employer may not charge rent in excess of the values listed herein.

## 11. MEAL PERIODS

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee.

(B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee

with a second meal period of not more than one hour need not be provided if the total hours of work is 12 hours or less. The second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

(C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(D) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

(E) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

(F) This section shall not apply to any public transit bus driver covered by a valid collective bargaining agreement if the agreement expressly provides for meal periods for those employees, final and binding arbitration of disputes concerning application of its meal period provisions, premium wage rates for all overtime hours worked, and regular hourly rate of pay of not less than 30 percent more than the State minimum wage rate.

## 12. REST PERIODS

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half ($3^{1}/_{2}$) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

(C) This section shall not apply to any public transit bus driver covered by a valid collective bargaining agreement if the agreement expressly provides for rest periods for those employees, final and binding arbitration of disputes concerning application of its rest period provisions, premium wage rates for all overtime hours worked, and regular hourly rate of pay of not less than 30 percent more than the State minimum wage rate.

## 13. CHANGE ROOMS AND RESTING FACILITIES

(A) Employers shall provide suitable lockers, closets, or equivalent for the safekeeping of employees' outer clothing during working hours, and when required, for their work clothing during non-working hours. When the occupation requires a change of clothing, change rooms or equivalent space shall be provided in order that employees may change their clothing in reasonable privacy and comfort. These rooms or spaces may be adjacent to but shall be separate from toilet rooms and shall be kept clean.

**NOTE:** This section shall not apply to change rooms and storage facilities regulated by the Occupational Safety and Health Standards Board.

(B) Suitable resting facilities shall be provided in an area separate from the toilet rooms and shall be available to employees during work hours.

## 14. SEATS

(A) All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.

(B) When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.

## 15. TEMPERATURE

(A) The temperature maintained in each work area shall provide reasonable comfort consistent with industry-wide standards for the nature of the process and the work performed.

(B) If excessive heat or humidity is created by the work process, the employer shall take all feasible means to reduce such excessive heat or humidity to a degree providing reasonable comfort. Where the nature of the employment requires a temperature of less than 60° F., a heated room shall be provided to which employees may retire for warmth, and such room shall be maintained at not less than 68°.

(C) A temperature of not less than 68° shall be maintained in the toilet rooms, resting rooms, and change rooms during hours of use.

(D) Federal and State energy guidelines shall prevail over any conflicting provision of this section.

## 16. ELEVATORS

Adequate elevator, escalator or similar service consistent with industry-wide standards for the nature of the process and the work performed shall be provided when employees are employed four floors or more above or below ground level.

## 17. EXEMPTIONS

If, in the opinion of the Division after due investigation, it is found that the enforcement of any provision contained in Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; Section 14, Seats; Section 15, Temperature;

or Section 1 Elevator to avoid undue hardship when the written consent of employees and the ownership on the employer, exemption may be made at the discretion of the Division. Such exemptions shall be in writing to be effective and may be revoked after reasonable notice is given in writing. Application for exemption shall be made by the employer or by the employee and/or the employee's representative to the Division in writing. A copy of the application shall be posted at the place of employment at the time the application is filed with the Division.

## 18. FILING REPORTS
(See California Labor Code, Section 1174(a))

## 19. INSPECTION
(See California Labor Code, Section 1174)

## 20. PENALTIES
(See California Labor Code, Section 1199)

(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of:

(1) Initial Violation — $50.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages.

(2) Subsequent Violations — $100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages.

(3) The affected employee shall receive payment of all wages recovered.

(B) The labor commissioner may also issue citations pursuant to California Labor Code Section 1197.1 for non-payment of wages for overtime work in violation of this order.

## 21. SEPARABILITY
If the application of any provision of this order, or any section, subsection, subdivision, sentence, clause, phrase, word, or portion of this order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein.

## 22. POSTING OF ORDER
Every employer shall keep a copy of this order posted in an area frequented by employees where it may be easily read during the workday. Where the location of work or other conditions make this impractical, every employer shall keep a copy of this order and make it available to every employee upon request.

**QUESTIONS ABOUT ENFORCEMENT** of the Industrial Welfare Commission orders and reports of violations should be directed to the Division of Labor Standards Enforcement. A listing of the DLSE offices is on the back of this wage order. Look in the white pages of your telephone directory under CALIFORNIA, State of, Industrial Relations for the address and telephone number of the office nearest you. The Division has offices in the following cities: Bakersfield, El Centro, Fresno, Long Beach, Los Angeles, Oakland, Redding, Sacramento, Salinas, San Bernardino, San Diego, San Francisco, San Jose, Santa Ana, Santa Barbara, Santa Rosa, Stockton, Van Nuys.

---

### SUMMARIES IN OTHER LANGUAGES

The Department of Industrial Relations will make summaries of wage and hour requirements in this Order available in Spanish, Chinese and certain other languages when it is feasible to do so. Mail your request for such summaries to the Department at: P.O. box 420603, San Francisco, CA 94142-0603.

### RESUMEN EN OTROS IDIOMAS

El Departamento de Relaciones Industriales confeccionara un resumen sobre los requisitos de salario y horario de esta Disposicion en español, chino y algunos otros idiomas cuando sea posible hacerlo. Envie por correo su pedido por dichos resumenes al Departamento a: P.O. box 420603, San Francisco, CA 94142-0603.

### 其他文字的摘錄

工業關係處將把摘錄本規則中有關工資和工時的規定，用西班牙文、中文印出。其它文字如有需要，也將同樣辦理。如果您有需要，可以來信索閱，請寄到： Department of Industrial Relations P.O. box 420603 San Francisco, CA 94142-0603

All complaints are handled confidentially. For further information or to file your complaints, contact the State of California at the following department offices.

**Division of Labor Standards Enforcement (DLSE)**

**BAKERSFIELD**
Division of Labor Standards Enforcement
7718 Meany Ave.
Bakersfield, CA  93308
661-587-3060

**EL CENTRO**
Division of Labor Standards Enforcement
1750 W. Main St.
El Centro, CA  92643
760-353-0607

**FRESNO**
Division of Labor Standards Enforcement
770 E. Shaw Ave., Suite 222
Fresno, CA  93710
559-244-5340

**LONG BEACH**
Division of Labor Standards Enforcement
300 Oceangate, 3rd Floor
Long Beach, CA  90802
562-590-5048

**LOS ANGELES**
Division of Labor Standards Enforcement
320 W. Fourth St., Suite 450
Los Angeles, CA 90013
213-620-6330

**OAKLAND**
Division of Labor Standards Enforcement
1515 Clay Street, Room 801
Oakland, CA  94612
510-622-3273

**REDDING**
Division of Labor Standards Enforcement
2115 Civic Center Drive, Room 17
Redding, CA  96001
530-225-2655

**SACRAMENTO**
Division of Labor Standards Enforcement
2031 Howe Ave, Suite 100
Sacramento, CA  95825
916-263-1811

**SALINAS**
Division of Labor Standards Enforcement
1870 N. Main Street, Suite 150
Salinas, CA  93906
831-443-3041

**SAN BERNARDINO**
Division of Labor Standards Enforcement
464 West 4th Street, Room 348
San Bernardino, CA  92401
909-383-4334

**SAN DIEGO**
Division of Labor Standards Enforcement
7575 Metropolitan, Room 210
San Diego, CA  92108
619-220-5451

**SAN FRANCISCO**
Division of Labor Standards Enforcement
455 Golden Gate Ave. 10th Floor
San Francisco, CA  94102
415-703-5300

**SAN FRANCISCO – HEADQUARTERS**
Division of Labor Standards Enforcement
455 Golden Gate Ave. 9th Floor
San Francisco, CA  94102
415-703-4810

**SAN JOSE**
Division of Labor Standards Enforcement
100 Paseo De San Antonio, Room 120
San Jose, CA  95113
408-277-1266

**SANTA ANA**
Division of Labor Standards Enforcement
605 West Santa Ana Blvd., Bldg. 28, Room 625
Santa Ana, CA  92701
714-558-4910

**SANTA BARBARA**
Division of Labor Standards Enforcement
411 E. Canon Perdido, Room 3
Santa Barbara, CA  93101
805-568-1222

**SANTA ROSA**
Division of Labor Standards Enforcement
50 "D" Street, Suite 360
Santa Rosa, CA  95404
707-576-2362

**STOCKTON**
Division of Labor Standards Enforcement
31 E. Channel Street, Room 317
Stockton, CA 95202
209-948-7771

**VAN NUYS**
Division of Labor Standards Enforcement
6150 Van Nuys Boulevard, Room 206
Van Nuys, CA  91401
818-901-5315

EMPLOYERS:    Do not send copies of your alternative workweek
election ballots or election procedures.

Only the results of the alternative workweek election
shall be mailed to:

Department of Industrial Relations
Office of Policy, Research and Legislation
P.O. Box 420603
San Francisco, CA  94142-0603
(415) 703-4780

Prevailing Wage Hotline (415) 703-4774

—10

# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 14-00561 JVS(ANx)                    Date   August 11, 2014

Title   Jeremy Fardig, et al. v. Hobby Lobby Stores Inc.   .

Present: The
Honorable          James V. Selna

Karla J. Tunis                                  Sharon Seffens
Deputy Clerk                                  Court Reporter

Attorneys Present for Plaintiffs:           Attorneys Present for Defendants:

Matthew Bainer                                Cheryl Orr / Philippe Lebel

**Proceedings:     Plaintiff's Motion for Reconsideration (Fld 6-24-14)**

**Cause called and counsel make their appearances.   The Court's tentative
ruling is issued.   Counsel make their arguments.   The Court DENIES the plaintiff's
motion and rules in accordance with the tentative ruling as follows:**

Plaintiffs Jeremy Fardig ("Fardig"), Jeremy Wright ("Wright"), and Christian
Bolin ("Bolin") (collectively, "Plaintiffs") move this Court for reconsideration of its June
13, 2014 Order granting Defendant Hobby Lobby Stores, Inc.'s ("Hobby Lobby") motion
to stay all proceedings and compel arbitration. (Mot., Docket No. 21.) Hobby Lobby
opposes the motion. (Opp'n, Docket No. 22.) Plaintiffs have replied. (Reply, Docket No.
25.)

For the following reasons, the Court DENIES the motion for reconsideration.

## I.   **Background**

The factual background to this case is familiar to the parties and to the Court.

This putative class action arises out of the employment relationship between
Plaintiffs and Hobby Lobby. Fardig, Wright, and Bolin were all employed as non-exempt
assistant managers at one or more of Hobby Lobby's California retail stores between
2012 and 2013.[1] (Shatara Decl. Ex. A ("Compl.") ¶¶ 11, 13, 15, Docket No. 7.) As a

---

[1] Fardig, Wright, and Bolin voluntarily terminated their
employment with Hobby Lobby on October 23, 2013, November 16,
2013, and October 23, 2013, respectively. (Mumm Decl. Ex. G-I,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 14-00561 JVS(ANx)                    Date   August 11, 2014

Title   Jeremy Fardig, et al. v. Hobby Lobby Stores Inc.   .

condition of their employment, Plaintiffs each signed a copy of Hobby Lobby's Mutual
Arbitration Agreement ("Arbitration Agreement" or "Agreement").[2] (Mumm Decl. Ex.
A–C.)

Under the terms of the Agreements signed by Plaintiffs, Plaintiffs and Hobby
Lobby mutually agreed to arbitrate all disputes arising from Plaintiffs' employment.[3] (Id.)
The Agreements provide:

> Employee and Company hereby agree that any dispute, demand, claim,
> controversy, cause of action, or suit . . . that Employee may have, at any time
> following the acceptance and execution of this Agreement, with or against
> Company . . . that in any way arises out of, involves, or relates to Employee's
> employment with Company or the separation of Employee's employment with
> Company . . . shall be submitted to and settled by final and binding arbitration in
> the county and state in which Employee is or was employed.

(Id.) The Arbitration Agreements further state that "Employee and Company are mutually
agreeing to submit all Disputes contemplated in this Agreement to arbitration, rather than
to a court." (Id.)

Notably, the Agreements provide for the waiver of class, collective, and joint
claims:

> The parties agree that all Disputes contemplated in this Agreement shall be
> arbitrated with Employee and Company as the only parties to the arbitration, and
> that no Dispute contemplated in this Agreement shall be arbitrated, or litigated in a

---

Docket No. 11-1.)

  [2] Fardig, Wright, and Bolin also signed substantially
similar arbitration agreements as part of their applications to
work for Hobby Lobby. (Mumm Decl. Ex. D-F.)

  [3] The Agreements do exempt "claims for benefits under
unemployment compensation laws or workers' compensation laws" and
reserve the rights of the parties to "file claims with federal,
state, or municipal government agencies." (Id.) These exceptions
are inapplicable to the present case.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-00561 JVS(ANx) | Date | August 11, 2014 |

| | |
|---|---|
| Title | Jeremy Fardig, et al. v. Hobby Lobby Stores Inc. . |

court of law, as part of a class action, collective action, or otherwise jointly with any third party.

(Id.)

Plaintiffs filed this action in Orange County Superior Court on February 18, 2014. (Compl.) The Complaint alleges violations of various provisions of the California Labor Code and California Business Professions Code section 17200. (Id. ¶¶ 32–76.) Plaintiffs assert these claims on behalf of a putative class of non-exempt managerial employees employed by Hobby Lobby and a putative class of non-exempt retail employees employed by Hobby Lobby. (Id. ¶ 24.) Hobby Lobby removed the action to this Court on April 10, 2014. (Not. of Removal, Docket No. 1.)

On June 13, 2014, the Court granted Hobby Lobby's motion to compel the arbitration of Plaintiffs' claims on an individual basis pursuant to the Arbitration Agreements and stayed all proceedings pending completion of the arbitration. (Order, Docket No. 19.) The Court rejected Plaintiffs' argument that the Agreements were unconscionable for, among other things, including a waiver of Plaintiffs' rights to pursue Private Attorney General Act ("PAGA") claims on a representative basis. The Court reasoned, in line with the majority of federal district courts to have confronted the issue, that holding that the waiver of representative PAGA claims rendered an arbitration agreement unenforceable would frustrate the purposes of the Federal Arbitration Act ("FAA"). (Id. at 9–11.) Should such a waiver be unenforceable under California law, that law would be preempted as an obstacle to the FAA's objectives. (Id.)

Plaintiffs seek reconsideration of that Order.

## II.   Legal Standard

"[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). In the Central District, Local Rule 7-18 governs motions for reconsideration:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-00561 JVS(ANx) | Date | August 11, 2014 |
| Title | Jeremy Fardig, et al. v. Hobby Lobby Stores Inc. . | | |

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.[4]

L.R. 7-18. The Court has discretion in determining whether to grant a motion for reconsideration. See Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation, 331 F.3d 1041, 1046 (9th Cir. 2003) ("Whether or not to grant reconsideration is committed to the sound discretion of the court.").

## III. **Discussion**

The sole issue on which Plaintiffs seek reconsideration is the Court's conclusion that the Agreements are not substantively unconscionable for containing a waiver of the right to bring collective claims under the Private Attorney General Act, Cal. Lab. Code § 2699, et seq. (Mot. at 2–4.)

PAGA is a provision of the California Labor Code that permits plaintiffs to bring representative claims on behalf of other aggrieved employees for an employer's violation of the California Labor Code for the purpose of collecting civil penalties. Cal. Lab. Code § 2699, et seq. PAGA essentially deputizes aggrieved employees and permits them to seek penalties for labor law violations "that could otherwise only be assessed by California's Labor and Workforce Development Agency." Cunningham v. Leslie's Poolmart, Inc., 2013 WL 3233211, at *5 (C.D. Cal. June 25, 2013).

---

[4] See also School Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993) (providing that reconsideration is appropriate if the movant demonstrates clear error, manifest injustice, newly discovered evidence, or an intervening change in controlling law).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-00561 JVS(ANx) | Date | August 11, 2014 |

| | |
|---|---|
| Title | Jeremy Fardig, et al. v. Hobby Lobby Stores Inc. . |

In its prior Order, the Court held that PAGA claims appeared to be arbitrable on an individual basis, and that even if a waiver of the right to bring representative PAGA claims was unenforceable under California law, any conclusion that such unenforceability rendered the Agreements unconscionable was preempted due to the burdens it would place on accomplishing the FAA's goals of respecting arbitration agreements wherever possible. (Order at 9–11.) In AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1753 (2011), the Supreme Court held that the FAA preempted the California state-law rule finding that class action waivers in a consumer arbitration agreement were unconscionable. Moreover, the Concepcion Court made clear that any state-law rule standing as an obstacle to the accomplishment of the FAA's objectives of enforcing arbitration agreements according to their terms to allow for efficient procedures tailored to the specific dispute was preempted. Id. at 1748. The Court followed the majority of district court opinions to address the issue in holding that allowing the prosecution of representative PAGA claims, where such claims have been waived in an arbitration agreement, would slow the dispute resolution process, in opposition to the FAA's goals. See, e.g., Parvataneni v. E*Trade Financial Corp., 967 F. Supp. 2d 1298, 1304–05 (N.D. Cal. 2013); Miguel v. JPMorgan Chase Bank, N.A., 2013 WL 452418, at *9 (C.D. Cal. Feb. 5, 2013); Morvant v. P.F. Chang's China Bistro, Inc., 870 F. Supp. 2d 831, 845–46 (N.D. Cal. 2012); Quevedo v. Macy's, Inc., 798 F. Supp. 2d 1122, 1140–42 (C.D. Cal. 2011); Grabowski v. Robinson, 817 F. Supp. 2d 1159, 1181 (S.D .Cal. 2011).

Ten days after the Court issued its prior Order, the California Supreme Court addressed the issue of whether PAGA claims are arbitrable and whether the FAA preempts any rule rendering PAGA waivers unenforceable. See Iskanian v. CLS Transp. L.A., LLC, 59 Cal. 4th 348 (2014). In Iskanian, the court held definitively that as a matter of California law, an employee's right to bring a representative PAGA claim cannot be waived and any purported waiver in an arbitration agreement is unenforceable as a matter of state law. Id. at 383–84.

The California Supreme Court acknowledged that such a rule could be preempted if it stood in the way of the FAA's objectives, but reasoned that the FAA was aimed only at ensuring the efficient resolution of private disputes, while PAGA actions involved disputes between an employer and the state Labor and Workforce Development Agency. Id. at 384. The Court noted that in all but one case, the U.S. Supreme Court's cases interpreting the FAA involved disputes only involving the parties' own rights and obligations, rather than those of a public enforcement agency. See id. at 385–86. The one

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 14-00561 JVS(ANx) | Date | August 11, 2014 |
|---|---|---|---|

| Title | Jeremy Fardig, et al. v. Hobby Lobby Stores Inc. . |
|---|---|

case facing different circumstances held that the Equal Employment Opportunity Commission ("EEOC") was not barred by an arbitration agreement because the EEOC was not a party to the agreement, could prosecute the claim without the employee's consent, and the employee had no right to control the litigation. Id. at 386 (citing EEOC v. Waffle House, Inc., 534 U.S. 279, 288–91 (2002)).

While Hobby Lobby does not contest, nor could it, that the California Supreme Court is the final authority on the interpretation of California law, it remains the case that whether or not a California rule is preempted by the FAA is a question of federal law. In their papers, Plaintiffs seem to imply that because the California Supreme Court has determined that the rule against representative PAGA claim waivers is not preempted, and that decision can only be reviewed directly by the U.S. Supreme Court, that this Court is bound by its holding on the preemption issue. (See Mot. at 4; Reply at 2–3.) But that position is emphatically false. Preemption is an issue of federal law. The Court is not bound by a state court's interpretation of federal law, but rather must examine for itself whether the state rule is consistent with the structure and purpose of the federal rule. See, e.g., Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992); Kilgore v. KeyBank, Nat'l Ass'n, 673 F.3d 947, 960 (9th Cir. 2012) (holding that California rule permitting citizens to bring injunctive relief claims on behalf of the public was preempted by the FAA). Therefore, Iskanian's contrary reading of whether the PAGA waiver rule is preempted does not bind this Court.

Because the Iskanian decision is not actually a change in the law—or at least not controlling law—but rather only a contrary authority whose precedential value is persuasive instead of binding, the Court doubts whether reconsideration is even available under Local Rule 7-18. Moreover, assuming that the Iskanian decision permits the Court to reconsider its prior Order, the Court does not believe that it erred in holding the rule against representative PAGA claim waivers preempted. Unlike in Waffle House, where it was the EEOC actually bringing the suit, in this case Plaintiffs are the named parties, even if they stand in the shoes of a California agency. Moreover, it is Plaintiffs who would control the litigation. Finally, the Iskanian decision offers no persuasive answer to the Court's concerns, articulated in its prior order, regarding the aggregation of civil penalties and determining whether labor laws were violated as to other employees.

Even in light of Iskanian, the Court continues to hold that the rule making PAGA claim waivers unenforceable is preempted by the FAA. There is nothing in Iskanian that

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 14-00561 JVS(ANx) | Date | August 11, 2014 |

| | |
|---|---|
| Title | Jeremy Fardig, et al. v. Hobby Lobby Stores Inc. |

persuades the Court otherwise, and the Court is not bound by the California Supreme Court's understanding of federal law. The Court will therefore deny reconsideration of its prior Order. Plaintiffs may bring their PAGA claims as individuals or, to the extent this is not permitted by California law, as agents of the state, provided that the relief they may obtain is limited to what they could obtain as individuals.

## IV.   Conclusion

For the foregoing reasons, the Court DENIES the motion for reconsideration.

IT IS SO ORDERED.

| | | : | 07 |
|---|---|---|---|
| Initials of Preparer | | kjt | |

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | **Date** | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

sPresent: The Honorable   **BEVERLY REID O'CONNELL, United States District Judge**

| Renee A. Fisher | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      (IN CHAMBERS)

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [125]

### I.   INTRODUCTION

Plaintiffs Gerardo Ortega and Michael D. Patton[1] are regional and long-distance truck drivers employed by Defendant J.B. Hunt Transport Inc.  Plaintiffs contend that Defendant has failed to pay them at least a minimum hourly wage for certain required job-related activities.  Accordingly, they allege that Defendant is liable to them under California labor law.

Currently pending before the Court is Defendant J.B. Hunt Transport Inc.'s motion for summary judgment on all of Plaintiffs' remaining claims.  (Dkt. No. 125.)  According to Defendant, Plaintiffs' claims relate to the services it offers and the prices for those services, and consequently are preempted under the Federal Aviation Administration Authorization Act.  For the following reasons, Defendant's motion is GRANTED.

### II.   BACKGROUND

#### A. Factual Background

Defendant J.B. Hunt Transport Inc. is one of the largest transportation logistics companies in North America.  (First Am. Compl. ("FAC") ¶ 11.)  It provides at least two types of services for its customers: (1) Intermodal Services; and (2) Dedicated Contract

---

[1] Ortega and Patton are class representatives for all others similarly situated.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

Services ("DCS").[2]  (Def.'s Statement of Uncontroverted Facts ("SUF") ¶ 4; Dkt. No. 125-2.)  Through its Intermodal Services, Defendant's drivers deliver freight primarily to and from railways; through its Dedicated Contract Services, Defendant's drivers deliver freight on behalf of a particular customer on a regular basis.  (*Id.*)  Plaintiffs Gerardo Ortega and Michael Patton were formerly employed by Defendant as Intermodal Services drivers, based out of its location in South Gate, California.  (FAC ¶ 9.)  Ortega also worked for Defendant as a Dedicated Contract Services driver.  (FAC ¶ 9.)

Sometime during the 1990s, Defendant began to institute an Activity-Based-Pay ("ABP") compensation system.  (SUF ¶ 24.)  Instead of paying an hourly wage or a straight salary, Defendant's ABP system compensates drivers by allotting a rate per mile driven, in addition to other payments for specific non-driving activities, such as delivering a load of freight (a "drop").  (SUF ¶ 25.)  Drivers may receive hourly pay, however, while they wait during excessive customer delays.  (*Id.*)  Accordingly, there are certain activities for which Defendant's drivers are not directly compensated—by hourly pay or otherwise—such as loading and unloading freight, completing paperwork, performing inspections, or waiting for a customer.

Believing they were not compensated as required by California wage laws, Plaintiffs filed this action against Defendant.  In their complaint, Plaintiffs allege that Defendant routinely fails to pay its local and regional drivers the minimum wages set by California law for all hours worked, (FAC¶¶ 2, 26–34), as well as the wage it agreed to pay, (FAC ¶¶ 35–41).  In essence, Plaintiffs contend that Defendant's ABP system fails to provide at least minimum wage during portions of a driver's day, specifically, while performing certain tasks: (a) waiting in lines at intermodal terminals for periods of less than two hours; (b) performing pre- and post-trip inspections; (c) fueling vehicles; (d) waiting for dispatch to issue assignments; and (e) hooking and unhooking trailers.  (*See, e.g.*, FAC ¶ 29.)  They also claim that Defendant failed to furnish Plaintiffs with accurate itemized wage statements in writing.  (FAC ¶¶ 49–55.)

---

[2] In their complaint, Plaintiffs refer to DCS as "Direct Contract Services," while Defendant refers to it as "Dedicated Contract Services."  (*Compare* FAC ¶ 9 *with* Mot. 3.)  The Court will adopt Defendant's terminology.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

### B. Procedural Background

Plaintiffs filed their original complaint on December 27, 2007, (Dkt. No. 1), and a first amended complaint on November 17, 2008, (Dkt. No. 41). This Court stayed the case from June 19, 2009, until August 27, 2012, while a relevant case with potential ramifications on this action was appealed to the California Supreme Court. (Dkt. Nos. 66, 76.) On May 24, 2013, Defendant filed a motion for judgment on the pleadings with respect to Plaintiffs' meal and rest break claims, which the Court granted on October 2, 2013. (Dkt. No. 124.) In its order, the Court held that the Federal Aviation Administration Authorization Act ("FAAAA") preempts California's meal and rest break laws as applied to Defendant. (Dkt. No. 124, at 7–9.) It reasoned that those laws have a significant impact on Defendant's routes, services, and prices. (*Id.*) Accordingly, the Court granted judgment on the pleadings to Defendant as to Plaintiffs' third claim.

On October 18, 2013, Defendant filed the instant motion for summary judgment. (Dkt. No. 125.) In its motion, Defendant argues that California minimum wage laws, and the courts' interpretation of those laws, forbid an employer from using an ABP compensation system. (Mot. 1.) Accordingly, Defendant contends that those laws impact the "prices, routes, and services" of a motor carrier," and are therefore preempted by the FAAAA. (*Id.*)

### III.   LEGAL STANDARD

Summary judgment is appropriate when, after adequate discovery, the evidence demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A disputed fact is material where its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id.* A court may consider the pleadings, discovery and disclosure materials, and any affidavits on file. Fed. R. Civ. P. 56(c)(2). Where the moving party's version of events differs from the non-moving party's version, a court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | Date | June 3, 2014 |
|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | |

    The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party may satisfy that burden by showing "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

    Once the moving party has met its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 587. Only genuine disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248; *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (finding that the non-moving party must present specific evidence from which a reasonable jury could return a verdict in its favor). A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).

    Although a court may rely on materials in the record that neither party cited, it need only consider cited materials. Fed. R. Civ. P. 56(c)(3). Therefore, a court may properly rely on the non-moving party to specifically identify the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

    Finally, the evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson*, 477 U.S. at 253.

## IV.  DISCUSSION

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

In their complaint, Plaintiffs allege that Defendant is violating California Labor Code sections 221–223, 1194, and 1197.  (FAC ¶¶ 26–41.)  In essence, these laws require an employer to pay its employees at least the designated minimum wage, and may not withhold wages, or secretly pay less than what it has agreed to pay.  *See* Cal. Labor Code §§ 221–23, 1194, 1197.  According to Plaintiffs, Defendant violates these provisions by "refusing to pay hourly rates of at least the state-mandated minimum wage for time spent" doing various required, job-related activities.  (FAC ¶ 29.)  Although Defendant contends its "piece rate compensation system fully compensates drivers for [all] activities as part of a rate measured by the length of the routes driven," (Mot. 17; Field Decl. ¶ 8), this method of compensation has been held to be inadequate in *Armenta v. Osmose Inc.*, 135 Cal. App. 4th 314 (2005).

In *Armenta*, the California Court of Appeal held that "[t]he minimum wage standard applies to each hour worked by [an employee]."  *Armenta*, 135 Cal. App. 4th at 324.  In other words, "all hours must be paid at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation."  *Id.* at 323.  Or to put it yet another way, even if average hourly compensation meets the minimum wage rate, an employer violates California labor law if it does not actually provide at least minimum wage for each hour worked.  *See id.*

As discussed above, Defendant does not pay its drivers an hourly wage.  (*See* Ashmore Decl. ¶¶ 12–13.)  Instead, it pays them a certain amount for every mile they drive, in addition to lump sums for every delivery they make.  (*Id.*)  As a result, Defendant's drivers are not directly compensated for certain job-related activities, including loading and unloading freight, or waiting for a customer.[3]  Thus, Defendant's ABP system does not comply with California's minimum wage law, as interpreted in *Armenta*.[4]

---

[3] However, if the driver must wait for a customer longer than one and a half hours, it receives hourly compensation.

[4] In its motion, Defendant briefly argues the rule in *Armenta* is an erroneous interpretation of California law, and that its "ABP [system] is a lawful piece rate compensation system that fully compensates drivers for [all] activities as part of a rate measured by the length of the routes driven."  (*See* Mot. 16, 17 n.5.)  Nevertheless, Defendant neither cites any case law to support its contention, nor provides any

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

Apparently conceding for purposes of this motion that *Armenta* is viable, Defendant contends that Plaintiffs' claims constitute "exactly the kind of state regulatory interference in the market that Congress intended to preempt" when it enacted the FAAAA. (Mot. 19–20.) In "identify[ing] the domain expressly pre-empted" by a federal statute, a court must "focus first on the statutory language, which necessarily contains the best evidence of Congress' pre-emptive intent." *Dan's City Used Cars Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013). In enacting the FAAAA, Congress intended to preempt certain state laws: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service* of any motor carrier . . . *with respect to the transportation of property*."[5] 49 U.S.C. § 14501(c)(1) (emphasis added).[6] "[T]he key phrase, obviously, is 'relating to.'" *Morales*, 504 U.S. at 383. And "[t]he ordinary meaning of ['relating to'] is a broad one . . . and the words thus express a broad pre-emptive purpose." *Id.* Therefore, for preemption, state laws need only "*a connection with, or reference to*" a motor carrier's "price, route, or service . . . with respect to the transportation of property." *See Rowe*, 552 U.S. at 370. The Supreme Court has also emphasized that "preemption may occur

---

explanation as to why *Armenta* is erroneous. (*See* Mot. 17 n.5.) Instead, Defendant merely asserts that the California Supreme Court has not reviewed *Armenta*, and *Armenta*'s rule "violates federal preemption." (*Id.*) As to its first point, the Court is unaware of any legal doctrine that would require a state supreme court to review a lower court's statutory interpretation in order for it to be valid. As to its second point, it is not clear what Defendant seeks to argue. Defendant's arguments attempting to discount *Armenta* are therefore unpersuasive.

[5] The Supreme Court has interpreted this language in several different opinions. *See, e.g.*, *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008); *Dan's City Used Cars Inc. v. Pelkey*, 133 S. Ct. 1769 (May 13, 2013); *Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 133 S. Ct. 2096 (June 13, 2013); *cf. Morales v. Trans World Airlines Inc.*, 504 U.S. 374 (1992) (interpreting the precursor to § 14501(c)(1), whose application is identical).

[6] In its entirety, the preemption section provides, "Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | CV 07-08336 BRO (SHx) | Date | June 3, 2014 |
|----------|------------------------|------|--------------|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | |

even if a state law's effect on [prices], routes or services is only indirect," and "it makes no difference whether a state law is consistent or inconsistent with federal regulation." *Id.* (internal quotation marks omitted).  Finally, "pre-emption occurs at least where state laws have a '*significant impact*' related to Congress' *deregulatory* and *pre-emption-related* objectives," which the Court has described as "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices.'" *Id.* (emphasis added).

Nevertheless, the Supreme Court has recently cautioned that although the words "related to" express a "broad pre-emptive purpose," that does not mean "the sky is the limit." *Dan's City*, 133 S. Ct. at 1778.  To be preempted, the effect on rates, routes, or services must be more than "tenuous, remote, or peripheral," but the Court has not specified "where, or how, 'it would be appropriate to draw the line.'" *Rowe*, 552 U.S. at 371; *see also Dan's City*, 133 S. Ct. at 1778.  In borderline cases, the Ninth Circuit has directed that "the proper inquiry is whether the provision, directly or indirectly, 'binds the . . . carrier to a particular price, route or service and thereby interferes with competitive market forces within the . . . industry." *Am. Trucking Ass'ns v. City of L.A.*, 660 F.3d 384, 397 (9th Cir. 2011) *overruled on other grounds* by *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 133 S. Ct. 2096 (2013).

Here, California's minimum wage laws, upon which Plaintiffs' claims are based, are indeed "related to" Defendant's services themselves, as well as the price of those services.  As a matter of logic and basic economic principles, if Defendant were forced to change its current ABP compensation system to include hourly pay for "non-productive" activity, its labor costs would clearly be affected, and consequently so would the prices of the services it provides.  Defendant provides ample evidence to support this conclusion.

In his declaration, Darren Field indicates that driver compensation is a significant portion of costs associated with its Intermodal Services, "second only to rail costs."[7]

---

[7] Although Plaintiffs attempt to refute this in their opposition, (Opp'n 19–22), Field's declaration is uncontested.  Plaintiffs point to Field's deposition testimony as evidence that after rail costs come drayage costs, not driver compensation.  (*Id.*)  Yet Field never testified to that in his deposition.  (*See* Humphrey Decl. Ex. I, at 99–100.)  Instead, he indicated that driver compensation is a component of drayage costs, which comprises 35% of total costs.  (*Id.* at 96.)  Therefore, it is not inconsistent to say

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

(Field Decl. ¶ 5.) Field further explains that "[o]verall increases in labor costs would necessitate either an increase in the price charged to the customer, or a discontinuation of some service offerings." (*Id.*) The same is true of Defendants DCS services. In Frank Broadstreet's declaration, he affirmed that "[d]river compensation plays a critical role in [DCS] contracts as it usually represents the largest cost component to the DCS operations." (Broadstreet Decl. ¶ 6.) Common sense instructs that any increase to driver compensation would ultimately result in increased prices as well.

But beyond mere increases to the price of Defendant's services, altering its compensation system would also result in decreased efficiency and productivity. Under Defendant's ABP system, Drivers are compensated "on a per delivery basis." (Broadstreet Decl. ¶ 6; *see* Field Decl. ¶¶ 7–8, 11.) Again, as a matter of logic, it is readily apparent that a compensation system that rewards drivers for making deliveries to customers would incentivize drivers to make more deliveries, thus increasing efficiency and productivity. Yet Defendant also provides evidence that its ABP system in fact increases its drivers' efficiency and productivity.

Both Mr. Walker and Dr. Topel explain that changing to Defendant's ABP system increased DCS drivers' efficiency. According to Walker, the drivers' efficiency increased by an average of 8.2%, and their productivity by an average of 9.4%. (Walker Decl. ¶ 8.) According to Dr. Topel, efficiency increased by 6.4%, and productivity increased by 7%.[8] (Topel Decl. Ex. A, at 7, 16.) Intermodal drivers also experienced

---

that driver compensation is second only to rail costs—Field's declaration does not contradict his deposition testimony.

[8] Plaintiffs attempts to create a genuine issue by discounting Topel's report, arguing for example that he excluded "outliers" from his analysis. Nevertheless, from his report, it is clear that Dr. Topel did not simply remove "outlier" data points that would result in lower efficiency, but also removed "outlier" data that would result in higher efficiency. (*See* Topel Decl. Ex. A, at 15.) Plaintiffs also attempt to discount the relevancy of Topel's report, arguing that the sample size comprised only a small number of the overall class, and the drivers had differing job-related tasks. Nevertheless, Plaintiffs do not explain why a small sample size would not be statistically significant nonetheless, nor do they explain why differing tasks would affect the general principle of improved efficiency established by the analysis. Plaintiffs further attempt to discount the validity of Topel's findings by arguing that a person could reasonably infer increased efficiency resulted from drivers being aware they were being monitored. (Opp'n 14.) Yet, in so arguing, Plaintiffs wrest Topel's testimony and focus on only part of what he

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 07-08336 BRO (SHx) | Date | June 3, 2014 |
|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | |

improved efficiency by adopting the ABP system.  Darren Field indicates that in 2001 Defendant paid Intermodal drivers an hourly rate but paid DCS drivers under the ABP system.  (Field Decl. ¶ 10.)  He further explains that given the favorable increased efficiency by DCS drivers, Defendant decided to test a similar pay structure on a small group of Intermodal drivers.  (*Id.*)  Field affirms that following its change to the ABP system "the productivity of the typical driver increased markedly.  As a result, Intermodal operations in California discontinued hourly-based compensation in April 2002, and compensated drivers based on the mileage and activity-based pay system." (Field Decl. ¶ 14.)  Consequently, Defendant was able to provide services to more customers, even to those it previously could not serve due to prohibitive costs and insufficient profit margins.  (*Id.*)  Although much of the data that would have permitted an analysis similar to that of the DCS drivers' increased efficiency was lost, Dr. Topel utilized Intermodal driver payroll and Human Resources records to conduct an analysis.  (*See* Topel Decl. Ex. A, at 22–28.)  By comparing Intermodal driver payroll records from before and after the ABP system was implemented, Dr. Topel concluded that Intermodal drivers on average received 10% higher wages under the ABP system.  (*See id.*)  From these results, one may readily infer that Intermodal drivers also improved their efficiency under the ABP system, as under the new payment structure driver pay is directly linked to the number of deliveries made.  Thus, if the Intermodal drivers' wages increased, it is reasonable to infer the increase was due to increased deliveries completed.

Accordingly, the evidence in the record demonstrates that there is no genuine issue that Defendant's ABP system allows for greater efficiency and productivity.  Common sense dictates that increased efficiency and productivity enables Defendant to serve more customers at lower prices.  Therefore, in the Court's view, forcing Defendant to modify its ABP payment system by providing at least minimum wage for each hour worked would affect Defendant's services and prices in more than a "tenuous, remote, or peripheral" manner.  Indeed, the effect would even be significant.  Moreover, such a forced change would undoubtedly disrupt "'maximum reliance on competitive market

---

said.  (*See* Humphrey Decl. Ex. K, at 115–16.)  Topel explained that "the method of monitoring doesn't in any way bias the outcome of [the] study." (*Id.* at 116.)  Moreover, Plaintiffs fail to explain why the Intermodal drivers also increased efficiency even though they were never monitored.  As discussed below, Defendant determined the increase in efficiency based on a forensic analysis.  (*See* Topel Decl. Ex. A, at 22–28.)  Accordingly, Plaintiffs' arguments are unpersuasive.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | Date | June 3, 2014 |
|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | |

forces,' thereby [] 'efficiency, innovation, and low prices.'"  *See Rowe*, 552 U.S. at 370. For these reasons, the Court holds that Plaintiffs' wage claims are preempted under the FAAAA.

Plaintiffs raise several additional arguments in opposition to the instant motion. They contend Defendant's motion should be denied because it "moves for summary judgment on an alleged theory of liability that Plaintiffs have never asserted in this case." (Opp'n 1.)  True as it may be that Defendant's characterization of Plaintiffs' claims is overly broad, Plaintiffs' assertion that Defendant's motion must therefore be denied is without merit.  In its motion, Defendant frames Plaintiffs' claims as an attempt to force Defendant to "pay hourly wages for all time in which drivers are under [Defendant's] control." (Mot. 1.)  In their opposition, Plaintiffs argue that they "do not allege and the law does not require [Defendant] to switch from ABP to an hourly pay system, or any form of compensation scheme." (Opp'n 3.)  Instead, Plaintiffs attempt to argue that Defendant simply must "include payment for those activities" "that were previously excluded" from its compensation system.  (Opp'n 3.)  It is not clear what exactly Plaintiffs are asserting.  (*See* Opp'n 3:10–17.)  It appears they are advocating that Defendant do exactly what it claims it has done all along—use a "piece rate compensation system [that] fully compensates drivers for [all] activities as part of a rate measured by the length of the routes driven." (Mot. 17; Field Decl. ¶ 8.)  Nevertheless, even assuming *Armenta* does permit Defendant do use some type of piece rate compensation system, it is clear that Defendant must pay its drivers at least minimum wage for each hour worked.  *See* 135 Cal. App. 4th at 323–24; *accord Cardenas v. McLane Foodservices Inc.*, 796 F. Supp. 2d 1246 (C.D. Cal. 2011) ("[T]his court finds that a piece-rate formula that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked.").  Because the entire purpose of a piece-rate or ABP compensation system is to incentivize employees to minimize certain "non-productive" activities, forcing Defendant to provide hourly pay for those "non-productive" activities would largely limit the incentive to improve efficiency, effectively inhibiting the ABP system's objective.  Accordingly, even if Plaintiffs are correct, and Defendant could still implement some type of piece-rate compensation system, because Defendant would still have to provide hourly compensation under *Armenta*, Plaintiffs' claims are yet preempted under the FAAAA.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 07-08336 BRO (SHx)** | | Date | June 3, 2014 |
|---|---|---|---|---|
| Title | GERARDO ORTEGA, ET AL. V. J.B. HUNT TRANSPORT INC. | | | |

Plaintiffs also contend the Ninth Circuit's decision in *Mendonca* precludes a finding of preemption under the FAAAA.  (*See* Opp'n 23.)  In *Mendonca*, the Ninth Circuit held that, although it certainly had some effect, the effect of California's Prevailing Wage Law on public works contractors' prices, routes, and services was too "indirect, remote, and tenuous" to be preempted by the FAAAA.  *Cal. for Safe & Competitive Dump Truck Trans. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998).  This case is distinguishable from *Mendonca*, however.  Here, forcing Defendant to change its ABP compensation system would have greater effect than in *Mendonca*.  Not only would it increase the wages and therefore prices, but it would also reduce Defendant's efficiency and productivity, thus inhibiting Defendant's ability to effectively provide services to its customers and therefore effectively compete in the marketplace.  Accordingly, Plaintiffs' contention regarding the court's holding in *Mendonca* is unpersuasive.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' wage claims are preempted by the FAAAA.  Accordingly, Defendant's motion for summary judgment on those claims is GRANTED.  Defendant must submit a proposed judgment consistent with this order no later than June 16, 2014.

**IT IS SO ORDERED.**

|  |  :  |
|---|---|
| Initials of Preparer | rf |

# EXHIBIT G



# LexisNexis®

**TROY M. LINDELL, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, Plaintiff, vs. SYNTHES USA, SYNTHES USA SALES LLC, SYNTHES SPINE COMPANY, LP, Defendants.**

Case No.: No. 11-cv-02053-LJO-BAM

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

*2014 U.S. Dist. LEXIS 27706*

**March 4, 2014, Decided**
**March 4, 2014, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Class certification granted by *Lindell v. Synthes USA, 2014 U.S. Dist. LEXIS 62620 (E.D. Cal., May 6, 2014)*

**PRIOR HISTORY:** *Lindell v. Synthes, USA, 2012 U.S. Dist. LEXIS 65919 (E.D. Cal., May 10, 2012)*

**COUNSEL:** [*1] For Troy M. Lindell, On Behalf of Themselves and all Others Similarly Situated, Plaintiff: Angelica Kristen Jongco, LEAD ATTORNEY, Catha Worthman, Lewis Feinberg Renaker & Jackson, Oakland, CA; Charles Trudrung Taylor, LEAD ATTORNEY, Lang, Richert & Patch, Fresno, CA; Ana I. de Alba, Lang Richert and Patch, Fresno, CA; Sacha Crittenden Steinberger, Lewis Feinberg Lee Renaker & Jackson P.C., Oakland, CA.

For Mark Pope, Plaintiff: Ana I. de Alba, LEAD ATTORNEY, Lang Richert and Patch, Fresno, CA.

For Synthes USA, Synthes Spine Company, LP, Defendants: Colleen A Carolan, LEAD ATTORNEY, Blank Rome LLP, Los Angeles, CA; Harrison Lee, PHV, LEAD ATTORNEY, PRO HAC VICE, Anthony B. Haller, PHV, Larry R. Wood, PHV, PRO HAC VICE, Blank Rome LLP, Philadelphia, PA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA; Kathy PourSanae, Blank Rome, LLP, Los Angeles, CA.

For Synthes USA Sales LLC, Defendant: Harrison Lee, PHV, LEAD ATTORNEY, PRO HAC VICE, Anthony B. Haller, PHV, Larry R. Wood, PHV, PRO HAC VICE, Blank Rome LLP, Philadelphia, PA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), [*2] Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA; Colleen A Carolan, Blank Rome LLP, Los Angeles, CA; Kathy PourSanae, Blank Rome, LLP, Los Angeles, CA.

For Synthes Spine Company, LP, Synthes USA Sales LLC, Counter Claimants: Anthony B. Haller, PHV, Larry R. Wood, PHV, PRO HAC VICE, Blank Rome LLP, Philadelphia, PA; Colleen A Carolan, Blank Rome LLP, Los Angeles, CA; Howard M. Knee, Blank Rome LLP (Los Angeles), Los Angeles, CA; Michael S. Helsley, Wanger Jones Helsley PC, Fresno, CA.

For Synthes USA, Counter Claimant: Colleen A Carolan, LEAD ATTORNEY, Blank Rome LLP, Los Angeles, CA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA; Anthony B. Haller, PHV, PRO HAC VICE, Larry R. Wood, PHV, Blank Rome LLP, Philadelphia, PA.

For Troy M. Lindell, On Behalf of Themselves and all Others Similarly Situated, Counter Defendant: Angelica Kristen Jongco, LEAD ATTORNEY, Catha Worthman, Lewis Feinberg Renaker & Jackson, Oakland, CA; Charles Trudrung Taylor, LEAD ATTORNEY, Lang, Richert & Patch, Fresno, CA; Ana I. de Alba, Lang Richert and Patch, Fresno, CA.

For [*3] Synthes USA, Counter Claimant: Colleen A Carolan, LEAD ATTORNEY, Blank Rome LLP, Los Angeles, CA; Harrison Lee, PHV, LEAD ATTORNEY, Anthony B. Haller, PHV, PRO HAC VICE, Larry R. Wood, PHV, Blank Rome LLP, Philadelphia, PA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA.

For Synthes USA Sales LLC, Counter Claimant: Harrison Lee, PHV, LEAD ATTORNEY, Anthony B. Haller, PHV, PRO HAC VICE, Larry R. Wood, PHV, Blank Rome LLP, Philadelphia, PA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA; Colleen A Carolan, Blank Rome LLP, Los Angeles, CA.

For Synthes Spine Company, LP, Counter Claimant: Colleen A Carolan, LEAD ATTORNEY, Blank Rome LLP, Los Angeles, CA; Harrison Lee, PHV, LEAD ATTORNEY, Anthony B. Haller, PHV, PRO HAC VICE, Larry R. Wood, PHV, Blank Rome LLP, Philadelphia, PA; Howard M. Knee, LEAD ATTORNEY, Blank Rome LLP (Los Angeles), Los Angeles, CA; Kathy PourSanae, LEAD ATTORNEY, Blank Rome, LLP, Los Angeles, CA; Michael S. Helsley, LEAD ATTORNEY, Wanger Jones Helsley PC, Fresno, CA.

For [*4] Troy M. Lindell, On Behalf of Themselves and all Others Similarly Situated, Counter Defendant: Angelica Kristen Jongco, LEAD ATTORNEY, Catha Worthman, Lewis Feinberg Renaker & Jackson, Oakland, CA; Charles Trudrung Taylor, LEAD ATTORNEY, Lang, Richert & Patch, Fresno, CA; Ana I. de Alba, Lang Richert and Patch, Fresno, CA; Sacha Crittenden Steinberger, Lewis Feinberg Lee Renaker & Jackson P.C., Oakland, CA.

JUDGES: Barbara A. McAuliffe, UNITED STATES MAGISTRATE JUDGE.

OPINION BY: Barbara A. McAuliffe

OPINION

FINDINGS AND RECOMMENDATIONS GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;

ORDER DENYING PLAINTIFF'S MOTION TO STRIKE

I. INTRODUCTION

In this action for violations of the California Labor Code, Plaintiff Troy Lindell moves for class certification pursuant to *Fed. R. Civ. Pro. 23(a)* and *23(b)(3)*. (Doc. 87, 88.) Defendant Synthes [1] filed its opposition on November 5, 2013. (Doc. 115.) Plaintiff filed his reply brief on November 25, 2013. (Doc. 121.) The Court held oral arguments on February 24, 2014. (Doc. 138.) Counsel Angelica Jongco, Charles Taylor and Catha Worthman appeared in person for Plaintiff. Counsel Anthony Haller, Oliver Wanger and Micaela Neal appeared in person for Defendant.

   1   Defendants are [*5] comprised of three related entities: Synthes USA, Synthes USA Sales LLC, and Synthes Spine Company, LP. The Court refers to the Defendants collectively as "Synthes."

Having carefully considered the parties' submissions, oral arguments, and the entire record in this case, the Court recommends Plaintiff's Motion for Class Certification be GRANTED.[2]

   2   Plaintiff moves to strike the declaration of Raymond F. Dovell, offered by Synthes in opposition to Plaintiff's motion for class certification. (Doc. 120.) Synthes filed its opposition on January 31, 2014. (Doc. 129.) Plaintiff argues the Dovell declaration constitutes undisclosed expert testimony. (Doc. 120, 2: 4-7.) Synthes responds the Dovell declaration is not expert testimony, but rather, summary evidence pursuant to *Federal Rule of Evidence 1006*. (Doc. 129, 1: 2-13.) Having reviewed the Dovell declaration, the Court does not find the declaration probative in deciding Plaintiff's Motion for Class Certification. In ruling on Plaintiff's Motion for Class Certification, the Court has not relied upon the Dovell declaration. Accordingly, Plaintiff's Motion to Strike the Dovell declaration (Doc. 120) is DENIED as moot.

II. BACKGROUND

A. Factual [*6] Background

Synthes is a leading medical device company that designs, manufactures, markets, and distributes implants and instruments for surgery. Synthes employs specially trained sales consultants to market and sell its products to customer hospitals, surgery centers, and physicians. In California, Synthes has employed approximately 180 sales consultants across three sales divisions: (1) Trauma, (2) Spine, and (3) Craniomaxillofacial ("CMF") during the proposed class period, from December 13, 2007, through the present.

Sales consultants' duties are performed primarily in the field, away from Synthes' offices or facilities. Sales consultants make sales calls through in-person meetings with physicians and travel to diverse hospitals, doctors' offices, and other medical facilities. In addition to sales responsibilities, sales consultants attend surgeries, prepare operating rooms to implant Synthes' devices, and explain the manner in which a device should be implanted.

Synthes compensates its sales consultants, in whole or in part, on a commission basis. Some sales consultants are paid on a salary plus commission basis (at a commission rate between 2% and 8% of monthly sales), while others [*7] are eligible for straight commission, with no salary (at a regular commission rate of 12.5% of monthly sales).

## B. Plaintiff's Legal Claims

Plaintiff Troy Lindell, a former sales consultant for Synthes, challenges the legality of two employment policies. First, Plaintiff challenges Synthes' policy that similarly situated sales consultants are ineligible for business expense reimbursement. Second, Plaintiff challenges Synthes' policy of taking deductions from sales consultants' commissions.

Plaintiff alleges that both of these policies violate the California Labor Code. Specifically, Plaintiff alleges Synthes' expense reimbursement policies violate *California Labor Code § 2802*, which provides "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." *Cal. Lab. Code § 2802(a)*. Plaintiff alleges Synthes' deduction policies violate three provisions of the California Labor Code. Specifically, Labor Code § 221 makes it "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Lab. Code § 221. [*8] *Section 223* provides that "where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." Lab. Code § 223. Finally, Labor Code § 300 prohibits the assignment of wages except under very limited circumstances. Lab. Code § 300.[3]

3    In addition to the expense and deductions claims, Plaintiff has pled claims for waiting time penalties pursuant to Labor Code §§201-203. These claims, however, are entirely predicated on Plaintiff's ability to establish an expense or deduction violation. Similarly, Plaintiff's claims for unlawful business practices under *California Business and Professions Code § 17200* (the

"Unfair Competition Law" or "UCL"), and penalties under the California Private Attorney General Act, Labor Code § 2698 *et seq.* are predicated on Plaintiff's ability to establish liability for his expense or deduction claims. Neither party discussed these dependent claims or argued they implicated unique *Rule 23* concerns. Accordingly, the Court limits its Rule 23 analysis to the expense and deduction claims, and does not separately discuss these    [*9] dependent claims. However, the Rule 23 analysis of Plaintiff's expense and deduction claims applies with equal force to the waiting time, UCL and private attorney general claims.

## C. Challenged Policies

### 1. Synthes' Expense Reimbursement Policy

California sales consultants perform the same core job duties and have uniform job descriptions. (Doc. 88, Attach. 10) (Synthes' Sales Policy Manuals for the years 2009-2012 articulate uniform job descriptions); *see also,* Declaration of Jaqueline Meister [4], Doc. 88, Attach. 5; 49:2-6; 57:9-14; 53: 18- 54: 8; 60: 10-21) (testifying that the job descriptions and requirements are the same for all sales divisions).[5] In performing these duties, sales consultants have certain common expenses. For example, sales consultants are required by policy to maintain a separate business phone line with the phone number listed as "Synthes" with the phone company. (Doc. 89, Attach. 2) (Synthes' 2007 Sales Policy Manual states that "[a]ll Synthes Consultants are to maintain a separate and dedicated business phone line for Synthes business. This phone number will be listed as 'Synthes' with the phone company . . . The expenses for the Synthes phone line, phone equipment  [*10] and cell phones are the responsibility of the Consultant.") Other potentially common business expenses may include home office, internet, freight, automobile and other travel related expenses.

4    Jaqueline Meister was Synthes' designated witness pursuant to *Fed. R. Civ. P. 30(b)(6)*.
5    Indeed, at oral argument, Counsel for Synthes acknowledged that the job requirements are the same across all three sales divisions.

Plaintiff cites documentary evidence that Synthes' policy did not reimburse straight commission sales consultants ("SC Sales Consultants") for ordinary business expenses. For Trauma and Spine SC Sales Consultants, Synthes' 2007 and 2010 policy manuals provide the following guidance for expense reimbursement:

The current commission rate for a Sales Consultant receiving straight com-

mission is 12.5%. Sales Consultants who convert to straight commission are not eligible for an automobile allowance or in-territory business expense reimbursements.

Doc 89, Attach. 2 at 427, 436; Attach. 3 at 536, 540. For CMF SC Sales Consultants, the 2007 and 2010 policy manuals state:

> When a Sales Consultant's territory reaches an annualized volume sales of $600,000 or more, the Regional Manager may recommend [*11] that the Sales Consultant converts his/her compensation package from salary, commission plus expenses, to a predetermined base salary of $30,000, plus a higher level of commissions with no expenses.

Doc. 89, Attach. 2, at 432; Attach. 3 at 532. With respect to open sales territories [6], as applied to all sales divisions, the 2007 and 2010 manuals provides that sales consultants will receive expense reimbursement when covering open sales territory if "their normal compensation package includes business expense reimbursement." Doc. 89, Attach. 2, at 431; Attach. 3 at 534-35. Plaintiff also refers to Synthes' travel and expense policy, providing that "field employees who are on straight commission will not be reimbursed for their expenses while they are in-territory." Doc. 88, Attach. 4 at 585 (Emphasis in original).

> 6    "In-territory," and "open territory" are terms of sales parlance. "In-territory" describes a customer group or geographic district for which an individual sales consultant holds responsibility. "Open territory" describes a customer group or geographic district for which there is no responsible individual sales consultant.

Synthes disputes Plaintiff's expense reimbursement claims [*12] and argues that SC Sales Consultants are indemnified for expenses through an enhanced commission. Synthes argues that managers orally communicate to SC Sales Consultants that the 12.5% enhanced commission covers necessary business expenses. Synthes cites the declarations of regional managers and current SC Sales Consultants, who state that sales consultants knew, based on oral communications with managers and Synthes' written policy, that they would generate more income as a SC Sales Consultant, inclusive of necessary business expenses, rather than a partially salaried sales consultant who receives direct expense reimbursement. (Synthes Opp., Doc. 115, 7: 27 - 13: 4.) Synthes also

points to its recent 2013 policy manuals as evidence that necessary business expenses are built into SC Sales Consultants enhanced commissions:

> A straight commission Sales Consultant is not eligible for a separate auto allowance or direct reimbursement of in-territory business expenses. Based on an allocation of $1,400 per period for expenses ($500 for auto allowance and $900 for variable expenses), payment for expenses is built into the total full commission compensation program. . .
>
> Upon conversion [to straight [*13] commission], the $500 per period auto allowance and up to $900 per period of reimbursable in-territory business expenses are built into the full commission base compensation plan.

Doc. 89, Attach 6 at 003543, 003545. Synthes claims this latest policy statement does not reflect a policy change, but rather, is a memorialization of its long-standing policy that expenses are built into the SC Sales Consultants increased commission.

## 2. Synthes' Commission Deduction Policy

Sales Consultants do not earn commissions until payment has been received and the sale is complete. Nevertheless, Synthes pays commissions in advance based on invoiced sales. Thus, even though a customer may take thirty or sixty (or more) days to pay Synthes for an invoiced product, a sales consultant receives his commission when the invoice is sent to the customer.

Synthes applies a uniform deduction policy to advanced commissions. The parties agree that Synthes' uniform deduction policy is applied in two circumstances. First, "Accounts Receivable" deductions include situations where (1) the customer claims not to have received a product that was delivered; (2) customer service receives an incorrect or invalid purchase order [*14] number; and/or (3) the customer advises Accounting that they have returned the product to the Sales Consultant but Synthes has no record of the return. Second, "Customer Service" deductions occur where an order is shipped without a purchase number and Synthes does not receive the purchase order within 25 business days. These latter scenarios tend to happen in emergency circumstances where the typical ordering process would not be prudent.

If the uniform deduction policy applies, Synthes deducts 50% of a product's list price from the sales con-

sultant's advanced, but unaccrued, commissions for a subsequent pay period.[7] Synthes' managerial employees testify that it is possible for a sales consultant to obtain a reversal of a deduction; however, Synthes' sales policy manual provides that *"policy dictates that extensions or reversals will not be granted."* (Doc. 116, Attach. 4, ¶ 8; Doc. 89, Attach. 2, Attach. 3) (emphasis in original). The evidence before the Court further shows that deductions are not reversed even if Synthes eventually receives payment for the sale. (Doc. 89, Attach. 5, 216:17-217:15)

> 7   When deductions do occur, Synthes limits the total deduction to no more than $2,000  [*15] per pay period. Where a deduction exceeds $2,000 for a given pay period, the deduction is subject to payment over multiple periods. (Doc. 115, 14: 27 - 15: 3.)

Plaintiff presents two challenges to Synthes' deduction policy. First, Plaintiff challenges the amount of deductions taken, i.e., sales consultants earn a commission equal to 2% - 12.5% of a product's list price, but Synthes takes deductions equal to 50% of a product's list price. Second, Plaintiff challenges the types of deductions taken, i.e., "Accounts receivable" and "Customer Service" deductions. Synthes argues that the amount of deductions it takes is lawful because no law proscribes the amount of deductions a company can take from "advanced," as opposed to "earned" commissions. Moreover, Synthes argues that determining whether a sales consultant has a viable deduction claim requires individual inquiries, making this case unsuitable for class certification.

#### D. Plaintiff's Motion for Class Certification

Based on the above-referenced legal theories, Plaintiff moves to certify two classes:

1) An "Expense Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California [*16] from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, and who are subject to the following "straight commission" compensation policies:

> a) The policy that Sales Consultants from the Trauma and Spine Sales Divisions who receive "straight commission" "are not eligible for an automobile allowance or in-territory business expense reimbursement"; and

> b) The policy that certain Sales Consultants from the CMF Sales Division receive "a predetermined base salary of

$30,000, plus a higher level of commission with no expenses;" and

2) A "Deductions Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition.

### III. DISCUSSION

#### A. Legal Standard Under Federal Rule of Civil Procedure 23

Class certification of Plaintiff's claims is governed by *Federal Rule of Civil Procedure 23*. Whether or not to certify a class is within the discretion of the Court. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL-CIO CLC v. ConocoPhillips Co., 593 F.3d 802, 807 (9th Cir. 2010).*

A  [*17] class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. These requirements are "commonly referred to as the numerosity, commonality, typicality, and adequacy requirements." *Norris-Wilson v. Delta-T Group, Inc., 270 F.R.D. 596, 601 (S.D.Cal. 2010)*. Plaintiff bears the burden of establishing that all four requirements of *Rule 23(a)* are met. *Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001)*.

In addition to the requirements imposed by *Rule 23(a)*, Plaintiff bears the burden of demonstrating that the class is maintainable pursuant to *Rule 23(b)*. *Narouz v. Charter Commc'ns, LLC, 591 F.3d 1261, 1266 (9th Cir. 2010)*. In this case, Plaintiff seeks certification of the Class under *Rule 23(b)(3)*. To certify a class under *Rule 23(b)(3)*, Plaintiff must demonstrate: (1) "questions of law or fact common to the members of the class predominate  [*18] over any questions affecting only individual members" ("Predominance") and (2) a class action is "superior to other available methods for the fair and efficient adjudication of the controversy" ("Superiority"). *Fed. R. Civ. P. 23(b)(3)*.

*Rule 23* is more than a pleading standard. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule - that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes,     U.S.    , 131 S. Ct.*

*2541 at 2552, 180 L. Ed. 2d 374 (2011)* ("*Dukes*") (emphasis in original). "[A]ctual, not presumed, conformance with *Rule 23(a)* remains . . . indispensable." *General Telephone Co. Of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).* When considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes, 131 S.Ct. at 2551-2; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 980 (9th Cir. 2011).*

### B. The Expense Class

#### 1. *Rule 23(a)* Requirements

#### i. Numerosity

*Rule 23(a)(1)* requires the members of a proposed [*19] class to be so numerous that joinder of all of the class members would be impracticable. *Fed. R. Civ. P. 23(a).* "Impracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir.1964)* (quoting *Advertising Specialty Nat. Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir.1956)).* Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir., 611 F. Supp. 990, 995 (C.D. Cal. 1984).*

Defendants do not dispute Plaintiffs have met the numerosity requirement, and the Court finds this requirement is met. Based upon the evidence before the Court, there appears to be at least 120 Expense Class members. Accordingly, the proposed Class satisfies the numerosity requirement of *Rule 23(a)(1).*

#### ii. Commonality

*Rule 23(a)(2)* requires "questions of law or fact common to the class." Historically, the requirements of *Rule 23(a)(2)* have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).* [*20] Indeed, "[e]ven a single [common] question" will satisfy the *Rule 23(a)(2)* inquiry. *Dukes, 131 S.Ct at 2556* (internal citation omitted).

The raising of any common question, however, does not suffice. *See Ellis v. Costco, 657 F.3d at 981; Dukes, 131 S.Ct. at 2551-52* ("[a]ny competently raised class complaint literally raises common 'questions.'") Rather, class representatives must demonstrate that common points of facts and law will drive or resolve the litigation. *Dukes,*

*131 S. Ct at 2552* ("What matters to class certification ... is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted). To satisfy *Rule 23(a)*'s commonality requirement, a class claim "must depend upon a common contention ... of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes, 131 S.Ct. at 2551.*

Plaintiff contends Synthes has a policy which does not reimburse Expense Class members for necessary business expenses  [*21] in violation of *Cal. Lab.Code § 2802.* Plaintiff also contends the legality of this policy can be evaluated on a class-wide basis. Synthes responds there are no common questions capable of class-wide resolution. Synthes argues the evidence demonstrates Expense Class member's necessary business expenses were indemnified through enhanced commission. Synthes further argues that these Expense Class members "knew" they would generate a higher income under the full commission model, and that regional managers orally communicate the expense allocation via enhanced commission to Expense Class. Lastly, Synthes argues that because the California Labor Code protects only "necessary" business expenses, individual inquiries are required to determine which expenses were necessary under the circumstances.

#### a. Whether Synthes' Enhanced Commission Complies With *Cal. Lab. Code § 2802* is a Common Question

*Cal. Lab.Code § 2802(a)* provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties ...." The California Supreme Court has held that "an employer may satisfy its statutory business  [*22] expense reimbursement obligation under *section 2802* by paying employees enhanced compensation in the form of increases in base salary or commission rates." *Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal.4th 554, 575, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007).*

Merely stating an employee's compensation is "enhanced" is insufficient. Pursuant to *Gattuso*, "the employer must provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement."" *Id. at 573.* Additionally, "an employer that uses salary and/or commission increases to discharge its reimbursement obligation must also communicate to its employees the method or basis for apportioning any increases in compensation between compensation for labor

performed and business expense reimbursement."[9] *Id. at 574.*

> 8 As noted in *Gattuso,* "[a]lthough *section 2802* does not expressly require the employer to provide an apportionment method, it is essential that employees and officials charged with enforcing the labor laws be able to differentiate between wages and expense reimbursements. Because providing an apportionment method is a practical necessity for effective enforcement [*23] of *section 2802* 's reimbursement provisions, it is implicit in the statutory scheme." *Gattuso, 42 Cal. 4th at 572.*
>
> 9 *Gattuso* suggests this methodology should be communicated to employees in writing. *Id. at fn. 6* ("In the future, employers that provide business expense reimbursement to employees through increases in base salary or commission rates should, in providing the documentation required by *section 226, subdivision (a),* separately identify the amounts that represent payment for labor performed and the amounts that represent reimbursement for business expenses.")

As stated in *Gattuso,* when an employer claims an enhanced commission discharges its reimbursement obligations under *Section 2802,* the validity of a *Section 2802* claim will turn on the resolution of three questions: (1) Did the employer adopt a practice or policy of reimbursing outside sales representatives for necessary business expenses by paying them higher commission rates? (2) If so, did the employer establish a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement? (3) If so, was the amount paid for expense reimbursement sufficient to fully reimburse [*24] the employees for the expenses they reasonably and necessarily incurred? *Id. at 576.*

Enhanced commission defenses to *Section 2802* claims generally present common questions of law and fact. *See, e.g., Schulz v. QualxServ, LLC, No. 09-cv-0017-AJB, 2012 U.S. Dist. LEXIS 58561, 2012 WL 1439066, at *3 (S.D. Cal. Apr. 26, 2012)* (Plaintiffs meet commonality "because they challenge uniform policies and systemic practices that apply to this class of employees." Also notable to the commonality analysis was the defendants' 'uniform defense' that they paid 'a higher salary that necessarily encompasses expenses'); *Hopkins v. Stryker Sales Corp., No. 5:11-CV-02786-LHK, 2012 U.S. Dist. LEXIS 67101, 2012 WL 1715091, *9 (N.D. Cal. May 14, 2012)* ("Whether Stryker paid a higher commission rate 'that necessarily encompasses expenses,' as Stryker argues, is 'a uniform defense' under *Gattuso*").

The Northern District of California's decision in *Stryker* confronted substantially similar claims and defenses and found commonality was met. In *Stryker,* former sales representatives brought a putative class action against Stryker Sales Corp. -- also a medical device company -- alleging that Stryker had a policy of not reimbursing sales representatives for their ordinary business [*25] expenses. Like here, the *Stryker* plaintiffs produced documentary evidence indicating that Stryker did not reimburse putative class members for ordinary business expenses. Also like here, the defendant in *Stryker* argued that ordinary business expenses were covered though sales commissions. *Stryker, 2012 U.S. Dist. LEXIS 67101, 2012 WL 1715091 at *2.* The *Stryker* Court found commonality met, stating that "the evidence shows that the putative class members worked as Stryker sales representatives in divisions with uniform business expense reimbursement policies that, Stryker claims, reimbursed putative class members' necessary business expenses primarily through Stryker's commission-based compensation system." *2012 U.S. Dist. LEXIS 67101, [WL] at *5.* Accordingly, "[w]hether Stryker paid a higher commission rate 'that necessarily encompasses expenses,' as Stryker argues, is 'a uniform defense' under *Gattuso." Id.*

This Court finds *Stryker's* reasoning persuasive. Whether Synthes' expense reimbursement policy complies with *Cal. Labor Code § 2802* and *Gattuso* presents common questions and uniform defenses that will drive the resolution of this case. At the very core of this case is the undisputed fact that Synthes does not separately reimburse the necessary [*26] business expenses of Expense Class members. On its face, this fact alone could create across-the-board liability under *Section 2802.* However, Synthes presents a uniform defense that applies to each and every Expense Class member: Synthes does not separately reimburse Expense Class members' business expenses because those expenses are covered through an enhanced commission permitted by *Gattuso.* Plaintiff disputes the expense policy complied with *Gattuso.* Whether Synthes paid a higher commission rate that encompasses expenses, as Synthes argues, is a uniform defense to a common contention. As in *Stryker,* whether Synthes' expense reimbursement policy for Expense Class members complies with *Section 2802* and *Gattuso* are common factual contentions and entails common claims and defenses. The claims and defenses here present "the classic case for treatment as a class action: that is, the commonality linking the class members is the dispositive question in the lawsuit." *Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1030 (9th Cir. 2012).*

Synthes' arguments to the contrary are not persuasive. Synthes urges the Court to find that, consistent with

*Section 2802* and *Gattuso,* Synthes necessarily [*27] indemnifies Expense Class members' business expenses through an enhanced commission. This argument fails for two reasons. First, the substance of the argument calls for a merits inquiry the Court does not reach at class certification. Whether Synthes' expense policy satisfies the California Labor code and *Gattuso* and properly indemnifies Expense Class members' business expenses through an enhanced commission is one of the central merits inquiries in this case. *See, Gattuso, 42 Cal. 4th at 576* ("was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the expenses they reasonably and necessarily incurred"). In order to assess commonality, courts consider the merits "only insomuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis, 285 F.R.D. at 506*; *accord Dukes, 131 S.Ct at 2553.* Here, the Court does not need to decide whether Synthes' expense policy complies with *Section 2802* to identify common questions.

On the contrary - and to the Court's second point - Synthes' raises a common defense to liability under *Section 2802* that is applicable to each [*28] and every Expense Class member. Whether the enhanced commission provided to every Expense Class member covers business expenses, as Synthes adamantly argues, is a common defense applicable to the Expense Class as a whole.

Synthes also argues there are no common questions because individual inquiries are required to evaluate Expense Class claims. Synthes argues that "*Section 2802* does not prescribe any one form on indemnification; what matters is that employees understand the employer's indemnification method." (Synthes' Opp., Doc. 115, 19: 2-4.) Synthes argues individual inquiries are required to determine if (1) Expense Class members knew their expenses; (2) Expense Class members knew the income generated from a straight commission structure would cover all their expenses; and (3) Synthes communicated expense allocation to Expense Class members. (Synthes' Opp., 18-21.)

Synthes' individual inquiry arguments are baseless. The language of *Section 2802* and *Gattuso* does not focus on an employee's subjective knowledge of her expenses as a means of evaluating an employer's liability. Rather, *Gattuso* focuses on the *employer's* actions. *Gattuso, 42 Cal. 4th at 577* ("Did the employer adopt [*29] a practice or policy ...?" "[D]id it [the employer] establish a method to apportion the enhanced compensation ...?" "[W]as the amount paid for expense reimbursement sufficient . . . ?") If an employer wishes to satisfy its statutory reimbursement obligation under *Section 2802* by paying employees increased commission

rates, the employer must take certain actions to identify the wages intended as expense reimbursement "in a way that would [not] seriously hamper or effectively preclude enforcement of the various statutory and contractual obligations." *Gattuso, 42 Cal. 4th at 572.* Regardless, Synthes raises a legal issue common to the Class. Whether an employee's understanding or subjective belief on expense reimbursement satisfies *Section 2802* and *Gattuso* is a legal question that is common to the Expense Class as a whole.

Synthes' argument concerning the communication of its expense policy is also unpersuasive. Synthes argues managers orally communicate expense allocation information to sales consultants by discussing whether or not the sales consultant will generate a higher income under a straight commission compensation structure.[10]

> 10   Notably, to the extent Synthes represents it communicates [*30] this information to *some,* but not all Expense Class members, then Synthes implicitly concedes violations of *Section 2802.*

Whether this oral communication satisfies *Gattuso* is a common question of fact. *Gattuso 42 Cal. 4th at fn. 6* ("In the future, employers that provide business expense reimbursement to employees through increases in base salary or commission rates should, in providing the documentation required by *section 226, subdivision (a)*, separately identify the amounts that represent payment for labor performed and the amounts that represent reimbursement for business expenses.")[11] Whether, in fact, Synthes actually communicates a formula or method to SC Sales Consultants is a common question. *Gattuso* states employers "*must* provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement." *Gattuso, 42 Cal. 4th at 573* (emphasis added). The evidence before the Court does not suggest Synthes provides a specific method or formula to Expense Class members. The evidence offered by Synthes indicates that some Expense Class members "knew" they would obtain higher income in a straight commission position [*31] with no separate reimbursement, when compared to a partially salaried position that included separate reimbursement of expenses. *See, e.g.,* Sorensen Decl. ¶ 6 ("In the many discussions which I have had with Sales Consultants leading up to the decision to convert or not, we specifically discuss making sure that their income following the conversion will exceed their base pay plus 4% commission plus their expense allowance"); Murray Decl., ¶ 10 ("[sales consultants] want to convert because they know that they will make much more money at a 12.5% commission rate, which is well above industry norms. . . . I help the Sales Consultant calculate the differential in income between the base plus

commission arrangement and the 12.5% enhanced commission rate so that he or she is certain that the amounts to be earned will more than fully cover their known business expenses as well as result in substantial additional income"); Bommarito Decl. ¶ 5 ("I personally reviewed the options and did the math . . ."); Felty Decl. ¶ 4 ("I also did my own calculations . . ."); Goeckeritz Decl. ¶ 4 ("I did the math . . .").[12]

> 11   *Section 226(a)* provides: "Every employer shall, semimonthly or at the time of each [*32] payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee. . . (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, ..." Thus, *Gattuso* suggests expense allocation information should be included in the written wage statements required under *Section 226*.

> 12   Synthes argues the progression of sales consultant compensation in Synthes' employ demonstrates expenses are built in the SC Sales Consultants' commission. (Synthes' Opp., Doc. 117, p. 6-7.) Specifically, when employment begins, sales consultants' compensation includes salary, a lower commission rate, plus specified expenses. Once a sales consultant has met certain requirements, they are eligible to graduate to straight commission at an enhanced rate. Synthes argues this progression demonstrates that necessary business expenses are built into the enhanced commission. *Id.* Once again, [*33] whether Synthes' straight commission expense policy indemnified necessary business expenses and otherwise satisfied the requirements of the California Labor Code and *Gattuso* is a common question that will drive the litigation.

Accordingly, whether the Synthes' "enhanced" commission, written policy and oral communication of the information discussed above satisfies *Section 2802* and otherwise complies with *Gattuso* is a common question capable of generating class-wide answers.

**b. Necessary Business Expenses Present a Common Issue**

*Cal. Lab.Code § 2802(a)* requires indemnification only for "necessary" business expenses. *See also, Gattuso, 42 Cal. 4th at 567* (*Section 2802* "requires an employer to indemnify its employees for expenses they necessarily incur in the discharge of their duties . . .) Thus, liability depends on whether "necessary" business expenses were identified.

Plaintiff argues a fact-finder could look at the Expense Class members' duties and common types of expenses to determine whether a type of expense is necessary to carry out those duties. Synthes responds that determining the "necessary" business expenses is an inherently individualized question focused on the "reasonableness" [*34] of the particular expenditure when it was incurred. By way of example, Synthes argues that Expense Class members' automobile expenses vary depending on the territory they serve and the use of assistant sales consultants, who aid in day-to-day activities. As another example, Synthes argues a sales consultant may use a single telephone line for both business and personal purposes. With respect to other expenses claimed by Plaintiff, Synthes argues some Expense Class members will have "few, if any" expenses concerning entertainment, office supply and shipping costs based on various hypothetical scenarios. For purposes of liability, Synthes argues each of these expenses must be evaluated, at the time they were incurred, to determine if each expense was reasonable and necessary.

Whether an expense was reasonably and necessarily incurred is a "question of fact that can be ascertained by a jury." *Stryker, 2012 U.S. Dist. LEXIS 67101, 2012 WL 1715091 at * 7* (citing *Takacs v. A.G. Edwards & Sons, Inc., 444 F.Supp.2d 1100, 1124-25 (S.D. Cal. 2006))*. When the evidence suggests there is a commonality of employment obligation and common types of expenses incurred by sales consultants, "the underlying legal issues and many of [*35] the factual determinations are common to all class members." *Dilts v. Penske Logistics, LLC 267 F.R.D. 625, 640 (S.D. Cal. 2010)* ("Given this commonality of employment obligation, an expense which is 'necessary' for a class member to do his job would also be "necessary" for any other class member"); *Stryker, 2012 U.S. Dist. LEXIS 67101, 2012 WL 1715091 at * 7* (where the putative class members had the same general duties and the evidence showed there were common types of expenses incurred by sales representatives, "a fact finder could look at the putative class members' duties and the common types of expenses and determine whether a type of expense is necessary to carry out those duties on a class-wide basis"); *Cf. Harris v. Vector Mktg. Corp., 753 F.Supp.2d 996, 1022 (N.D. Cal. 2010)* (declining to certify class where plaintiff failed to show "common types of expenses incurred by Sales Representatives").

Here, it is undisputed that all of the Expense Class members had the same general duties. Moreover, the evidence before the Court demonstrates Expense Class members share common expenses. Indeed, Synthes' own

documents show that some expenses incurred by Expense Class members, including communication, automobile, [*36] internet service, and home office expenses, are common across the Expense Class.[13] *See,* Synthes 2007 Policy Manuel at 471 ("All Synthes Consultants are to maintain a separate and dedicated business phone line for Synthes business . . . The expenses for the Synthes phone line, phone equipment and cell phones are the responsibility of the Consultant."); *Id.* at 449 (providing guidance for anticipated automobile expenses); *Id.* at 483 ("All Sales Consultants are required to purchase a computer based on the specification provided by Synthes. . . It is the responsibility of the Sales Consultant to obtain and maintain/service agreement for his/her PC . . . Each Sales Consultant is required to maintain the minimum configuration specified. The configuration specifies not only hardware but also operating system (i.e. Windows 98) and business software (i.e., Word, Excel, etc.) required.")

> 13   The facts of this case are in contrast to *Buchanan v. Homeservices Lending LLC, 2013 U.S. Dist. LEXIS 60156, 2013 WL 1788579 (S.D. Cal. Apr. 25, 2013),* relied upon by Synthes, where there was "no written policy mandating" the types of expenses that were necessary. *2013 U.S. Dist. LEXIS 60156, [WL] at \*5.*

The Court is not persuaded by Synthes' argument that variances [*37] in the amount and circumstances of certain expenses require the Court to individually inquire into whether the expense was reasonable and necessary when it was incurred. Synthes mistakenly focuses on the dollar amount of expenses rather than a category of expenses. Plaintiff claims that Synthes' written policies demonstrate Synthes does not reimburse *any* expenses whatsoever. Thus, the degree or amount to which these expenses were incurred is irrelevant under Plaintiff's theory of liability. Under Plaintiff's theory that Synthes does not reimburse any expenses, liability attaches for the entire Expense Class if Plaintiff can show Expense Class members all incurred a type or category of expenses, e.g., phone, automobile or home office. Once the category of expenses is established, the degree or amount to which these expenses were incurred concern damages, not liability.

For example, Synthes argues that some Expense Class members used their Synthes telephone for both business and personal purposes. Synthes argues that this individual's phone expenses would need to be scrutinized to identify which aspects of the phone bill were reasonable and necessary to conducting Synthes' business. However, [*38] if Synthes does not reimburse *any* phone expenses, it is irrelevant, for liability purposes, how often that sales consultant used the phone for per-

sonal reasons. To establish liability, all that is required is a demonstration that telephone expenses, in any amount and to any degree, are reasonable and necessary to conducting Synthes' business. If Plaintiff prevails on his theory that Synthes does not reimburse for any expenses, liability attaches when it is demonstrated that the use of a telephone is reasonable and necessary for Synthes' business. Once liability is established (the required use of a phone that was never reimbursed or indemnified), it does not matter if the telephone was used for Synthes' business 99% or 1% of the time. Variances such as these concern post-liability, damage calculations which do not defeat class certification.

Whether Synthes provides any expense reimbursement or indemnification, and whether Synthes communicates this information in a manner consistent with *Section 2802* and *Gattuso* are questions common to everyone in the Expense Class. Moreover, whether a business expense is necessary per *Section 2802* is a common question of fact that can be ascertained [*39] by a jury. Accordingly, the Court finds that questions of law and fact are common to the putative class.

### iii. Typicality

*Rule 23(a)(3)* requires the claims or defenses of the representative parties be typical of the claims or defenses of the class. The purpose of *Rule 23(a)(3)* is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir.1992).* Claims are "typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* The requirement is satisfied where the named plaintiff has the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct. *Hanon, 976 F.2d at 508.*

Plaintiff joined Synthes as a Sales Consultant in July 1999. Ex. 8, Lindell Dec. ¶3. At that time, Plaintiff's compensation structure was salary plus commission. Around November 2001, Plaintiff converted to "straight commission" compensation under which he received no separate expense reimbursement and remained on that compensation [*40] package until he left Synthes in May 2011. *Id.* ¶¶3-4. While at Synthes, Plaintiff performed the same job duties as other Expense Class members. These facts are undisputed.

The typicality requirement is met here because Plaintiff has alleged an injury identical to those of the Expense Class, stemming from uniform conduct taken against Plaintiff and the Expense Class. Plaintiff alleges that he, and the Expense Class members, were not fully

reimbursed for their necessary business expenses under *Cal. Lab. Code § 2802*. This alleged injury, asserted in unison on behalf of the Expense Class, resulted from Synthes' expense reimbursement policy. Synthes' expense reimbursement policy is common across the three divisions and not unique to Plaintiff and his division. Therefore, Plaintiff has sufficiently established that he is typical of the proposed class.

Synthes argues Plaintiff is not a typical representative because he does not have a viable individual expense reimbursement claim. Specifically, Synthes argues the evidence shows that Plaintiff "knew his business expenses and knew that his enhanced full commission rate included indemnification for those expenses[;]" thus, Plaintiff does not have   [*41] a claim under *Section 2802*. The evidence offered by Synthes shows Plaintiff subjectively believed, based on his independent determinations, he would generate a higher income. *See,* Lindell Dep., 108:8 - 109:4; 130: 14-20 ("Q: When you did your calculations in terms of deciding whether or not to opt to go to full commission did you also calculate based upon not only the allowance but also what your actual expenditures were to make sure that you would have all of that built in and more if you went to full commission? A: I tried. Yes.").

Discussed above, *supra,* Section III.B.1.ii.a., the relevant inquiry under *Section 2802* and *Gattuso* focuses on Synthes' actions, not on Plaintiff's subjective beliefs and independent determinations. The essential issues in determining the Expense Class claims are whether Synthes provides expense reimbursement or indemnification, and whether the "enhanced" commission offered by Synthes, coupled with oral communications describing the likelihood of a higher income, complies with *Section 2802* and *Gattuso.* That Plaintiff agreed to Synthes' expense reimbursement policy with the understanding he would generate higher income is inconsequential at the class certification   [*42] stage. If Synthes' expense reimbursement policy is deemed to violate *Section 2802*, Plaintiff and Expense Class members cannot be required to submit to an unlawful employment policy. *See, Cal. Lab. Code § 2804* ("Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, is null and void . . ."); *Gattuso, 42 Cal. 4th at 561* ("*section 2804*, expressly prohibits waiver of the rights afforded under *section 2802.*") Plaintiff alleges injuries identical to those in the Expense Class, and those alleged injuries flow from an identical course of conduct; namely, Synthes' expense reimbursement policy. Accordingly, Plaintiff's claims are typical of the Expense Class.

### iv. Adequacy of Representation

*Rule 23* requires that a class be certified only if "representative parties will fairly and adequately protect the interests of the class." This factor requires that (1) the proposed representatives do not have conflicts of interest with the proposed class, and (2) that the representatives and their counsel [14] will vigorously prosecute the action on behalf of the class. *Hanlon, 150 F.3d at 1020*.

> 14   Synthes does not challenge the adequacy of [*43] Plaintiffs' counsel, the law firms of Lewis Feinberg Renaker & Lackson, and Lang, Richart & Patch. The Court has reviewed the declarations of Plaintiff's counsel and finds that Plaintiff is represented by qualified and competent counsel. Plaintiff's counsel has a wealth of experience in employment class actions.

Synthes argues Plaintiff is not an adequate representative because there are conflicts between former employees such as Plaintiff, and current employees who are members of the Expense Class.[15] Specifically, Synthes suggests that currently employed Expense Class members prefer straight commission to alternative compensation options, whereas individuals such as Plaintiff are only interested in money damages and have no interest in the "benefits" of the straight commission system.

> 15   Synthes also argues Plaintiff is not an adequate representative for the same reasons discussed in the Court's typicality discussion. The Court rejects those arguments for the same reasons discussed therein, and does not readdress them here.

There is no conflict between Plaintiff's claims and those of currently employed Expense Class members. While some Expense Class members may be satisfied with Synthes'   [*44] compensation system, this lawsuit seeks to confer additional benefits on those class members. Plaintiff has not sought declaratory relief invalidating Synthes' straight commission structure. The relief Plaintiff seeks is identical to the relief sought by both current and former Synthes employees in the Expense Class. The relief sought by Plaintiff on behalf of the Expense Class is not in conflict with, or antagonistic to, currently employed Expense Class members who are compensated by an "enhanced" commission without separate expense reimbursement. Plaintiff's interests are aligned with Expense Class member's interests in recovering for unreimbursed business expenses. Therefore, Plaintiff is an adequate representative.

### 2. *Rule 23(b)(3)* Analysis

Having satisfied the requirements of *Rule 23(a)*, a plaintiff must next demonstrate that the action can be appropriately certified under *Rule 23(b)(1)*, *(b)(1)* or

*(b)(3)*. Plaintiff seeks to certify the class under *Rule 23(b)(3)*. To do so, Plaintiff must establish that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("Predominance") and (2) a class action is "superior  [*45] to other available methods for the fair and efficient adjudication of the controversy." ("Superiority"); *Fed. R. Civ. P. 23(b)(3)*.

### i. Predominance

Mere commonality pursuant to *Rule 23(a)(2)* is insufficient to meet *Rule 23(b)(3)*'s predominance requirement. *See Hanlon, 150 F.3d at 1022*. *Rule 23(b)(3)* instead concerns "the relationship between the common and individual issues." 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis.'" *Hanlon, 150 F.3d at 1022* (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed.1986)). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 489 (E.D. Cal. 2006)*. The *Rule 23(b)(3)* predominance analysis "focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication  [*46] by representation.'" *Wang v. Chinese Daily News, 737 F.3d 538, 545 (9th Cir. 2013)* (quoting *Hanlon, 150 F.3d at 1022*). As the Supreme Court recently emphasized, "*Rule 23(b)(3)* requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013)* (emphasis in original).

Synthes argues common issues do not predominate because the Court would need to make the following individual inquiries: (1) whether the Expense Class members knew his necessary expenses; (2) whether the Expense Class member understood his enhanced commission rate included specific allocation for those expenses; (3) whether a business expense was "necessary;" and (4) individual damage calculations will overwhelm common issues, citing *Comcast Corp. v. Behrend, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013)*. The Court has rejected the first two arguments as a misstatement of the law, while the third argument does not entail individualized inquiries. The Court now addresses Synthes' argument that individual damage calculations will overwhelm common issues pursuant to *Comcast*.

In  [*47] *Comcast*, the Supreme Court reversed an order granting class certification because the plaintiffs relied on a damage regression model that "did not isolate damages resulting from any one theory of antitrust impact." *Id. at 1431*. Specifically, the measure of damages flowed from four different antitrust theories; however, only one of those theories was viable at trial. Thus, the *Comcast* plaintiffs failed to link the asserted damages to the relevant theory of liability. *Comcast* concluded that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id. at 1433*.

Based on the Supreme Court's decision in *Comcast*, Synthes argues that individual expense calculations will overwhelm any common issues. For example, at oral argument, Synthes argued that a sales consultant may have a business phone expense, but nonetheless, uses that phone for personal reasons 25% of the time. Other examples offered by Synthes include variations in automobile, entertainment and home office expenses.

The Court disagrees with Synthes' interpretation of *Comcast*. The *Comcast* ruling reiterated a fundamental focus of the Rule 23 analysis: The  [*48] damages must be capable of determination by tracing the damages to the plaintiff's theory of liability. However, so long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat certification. *Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir.1975)* ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment"); *Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010)* ("The potential existence of individualized damage assessments ... does not detract from the action's suitability for class certification."). Post *Comcast*, the Ninth Circuit has reiterated this black letter rule. *Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013)* ("plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").[16] Thus, on individual damage calculations, the *Comcast* ruling breaks no new grounds, nor does it alter the existing class certification construct.

16   Indeed, the Supreme Court even clarified in *Dukes* that "individualized monetary claims belong in *Rule 23(b)(3)*." *Dukes, 131 S.Ct. at 2558*

The  [*49] damages relevant to the Expense Class claims concern necessary business expenses that, according to Plaintiff, were never reimbursed. If Expense Class members prove Synthes' liability, all the damages will flow from Plaintiff's theory of liability: Synthes' unlawful expense reimbursement policy. Unlike the plaintiffs in *Comcast*, Plaintiff's theory of liability here directly correlates with Plaintiff's claim for damages. As

discussed above, the degree to which these expenses were incurred - for example, a sales consultant using his Synthes phone for personal reasons 25% or 75% of the time - concerns the amount of damages and does not affect liability determinations. These individual damages calculations, under *Comcast* as interpreted by the Ninth Circuit, do not predominate. *Leyva 716 F.3d at 514*; *see also, Schulz, 2012 U.S. Dist. LEXIS 58561, 2012 WL 1439066, *6* (holding that such issues as "the distance driven between service calls and the particular plan selected for internet and cell phone services" relate to damages); *Balasanyan, 294 F.R.D. 550, 2013 WL 4517821, *7* ("Minor variations on a theme, such as the precise activities that salespeople were engaging in . . . , should not contain the seeds of destruction for a putative [*50] class.").

The following questions predominate and will drive the resolution of Plaintiff's claims: (1) Did Synthes adopt a practice or policy of reimbursing Expense Class members for necessary business expenses by paying them higher commission rates? (2) If so, did Synthes establish a method to apportion the enhanced commission payments between compensation for labor performed and expense reimbursement? (3) What are the "necessary" expenses reasonably incurred; and (4) Was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the expenses they reasonably and necessarily incurred?[17] The Court has determined these issues entail common claims and defenses that can be adjudicated in one stroke. Therefore, the Court finds that common issues predominate.

> 17    Notably, because Synthes argues its enhanced compensation "necessarily" reimburses all Expense Class members business expenses, this uniform defense makes this final question particularly suitable for class-wide resolution.

## ii. Superiority

The superiority requirement tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).* [*51] "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior." *Zinser, 253 F.3d at 1192.* Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determination of whether class certification is the superior method: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of con-

centrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *Fed. R. Civ. P. 23(b)(3)(A)-(D).*

Class adjudication is the superior method for resolving the claims at issue here. No class member would be required to individually establish her right to recover because all the merits determinations can be made on a class-wide basis. There is no evidence that Expense Class members have any interest in controlling prosecution of their claims separately. The Court is not aware of any other litigation raising the claims at issue here which [*52] has been commenced elsewhere on behalf of Expense Class Members. Concentrating this litigation in California is efficient because the entire Class is composed of California residents. Lastly, there will not be any undue difficulty in managing this litigation as a class action. Because Expense Class members can be identified from Synthes' records, individual notice can be readily accomplished. Moreover, while individual damage calculations are likely -- assuming liability is established -- the class size is sufficiently small such that individual damage calculations will not create any manageability problems. This employment action is well suited for class treatment, and litigation on a class basis is a superior method for adjudicating Plaintiffs' claims.

## C. The Deductions Class

### 1. Legal Standard For Commission Deduction Claims

Plaintiff's Deduction Class claims primarily fall under *Section 221 of the California Labor Code*. Labor Code *section 221* states that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Wages are defined to include "all amounts for labor performed by employees ... whether [*53] the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." *Cal. Lab. Code, § 200.* Under this definition, sales commissions are considered "wages." *Reid v. Overland Machined Products 55 Cal.2d 203, 207-208, 10 Cal.Rptr. 819, 359 P.2d 251 (1961); Koehl v. Verio, Inc. 142 Cal.App.4th 1313, 1329, 48 Cal.Rptr.3d 749 (2006).*

Labor Code *Section 221* prohibits an employer from deducting amounts from an employee's wages, even as a set-off for amounts clearly owed by the employee. *See Barnhill v. Robert Saunders & Co. 125 Cal.App.3d 1, 6, 177 Cal.Rptr. 803 (1981).* This prohibition reflects "California's strong public policy favoring the protection of employees' wages," including amounts earned through commissions on sales. *Harris v. Investor's Business Daily, Inc. 138 Cal.App.4th 28, 40-41, 41 Cal.Rptr.3d 108 (2006).* Labor Code *section 221*'s rights are nonnegotia-

ble and cannot be waived by the parties. *Cal. Lab.Code, § 219.* "By enacting [Labor Code*] section 221* ... the Legislature has prohibited employers from using self-help to take back any part of 'wages theretofore paid' to the employee, except in very narrowly defined circumstances [*54] provided by statute." *Hudgins v. Neiman Marcus Group, 34 Cal.App.4th 1109, 1121, 41 Cal. Rptr. 2d 46 (1995)*

One circumstance in which a wage deduction is permitted allows an employer to recover a commission that was "advanced" but not yet "earned." *Steinhebel v. Los Angeles Times Communications, LLC 126 Cal.App.4th 696, 705, 24 Cal. Rptr. 3d 351 (2005).* Generally, "[t]he essence of an advance is that at the time of payment the employer cannot determine whether the commission will eventually be earned because a condition to the employee's right to the commission has yet to occur or its occurrence as yet is otherwise unascertainable." *Id. at 705.* This principle is also embodied in Labor Code *section 224,* which provides in pertinent part that "[t]he provisions of *Sections 221, 222* and *223* shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages ... when a deduction is expressly authorized in writing by the employee to cover ... deductions not amounting to a rebate or deduction from the standard wage arrived at ... pursuant to wage agreement or statute...."; *see also, Adams v. Pacific Bell Directory, 216 F.3d 1082 (9th Cir. 2000)* ("For claims arising under *§ 221,* the employees' commissions [*55] are treated by *§ 224 of the California Labor Code* as "unearned" until [the employer] receives payment for the goods sold by the employee.")

Generally, the right to a commission depends on the terms of the parties' contract. "A commission is 'earned' when the employee has perfected the right to payment; that is, when all of the legal conditions precedent have been met. Such conditions precedent are a matter of contract between the employer and employee, subject to various limitations imposed by common law or statute." *Koehl, 142 Cal.App.4th at 1335.* Once the express contractual conditions are satisfied, the commission is considered a wage and an employer cannot recoup the commission once it has been paid to the employee. *Sciborski v. Pacific Bell Directory, 205 Cal. App. 4th 1152, 1167, 140 Cal. Rptr. 3d 808 (2012).*

An employer's right to define an "earned" commission in the employment contract is not unlimited. For example, an employer may expressly condition an earned sales commission on the sale becoming final (e.g., no returns within a specified time or final payment received) or on the employee completing work in providing follow-up services to the customer. *See Sciborski, 205 Cal. App. 4th at 1168* (listing [*56] cases and identifying circumstances where conditions to earning a commission

were permitted). But an employer is not entitled to "require[ ] its employees to consent to unlawful deductions from their wages." *Hudgins, 34 Cal. App. 4th at 1111-1112.* For example, "an employer may not require an employee to agree to a wage deduction in the guise of recouping an advance based on conditions that are unrelated to the sale and/or that merely reflect the employer's attempt to shift the cost of doing business to an employee." *Sciborski, 205 Cal. App. 4th at 1168; see also, Hudgins, 34 Cal. App. 4th at 1111-1112* ("retailer commission policy unlawful because it deducted wages for "unidentified returns," which potentially penalized an employee for the misconduct of other employees or customers"). Where a deduction is "unpredictable, and is taken without regard to whether the losses were due to factors beyond the employee's control," an employer "cannot avoid a finding that its [sales commission policy] is unlawful simply by asserting that the deduction is just a step in its calculation of commission income." *Hudgins, 34 Cal. App. 4th at 1123-1124.*

Synthes uniformly applies the following deduction [*57] policy to Deduction Class members:

## COMMISSION DEDUCTIONS

A. **Deductions from Unaccrued Commissions** If Synthes does not receive payment of an ordered item for any of the reasons specific in this section, 50% of the list price of the order will be deducted from the Sales Consultant's unaccrued commissions. The term "unaccrued commissions" includes both past and future advances.

(Synthes' 2007 Sales Policy Manual, Doc. 89, Attach. 2 at 440-443.) Synthes' policy manuals explain in further detail the circumstances in which Synthes will take a deduction. *See, Id.; See also,* Doc. 89, Attach. 3 at 496-497).

Plaintiff's claims on behalf of the Deductions Class are twofold. First, Plaintiff challenges the amount of deduction taken (50% of a product's list price). Plaintiff argues this policy is unlawful because sales consultants receive a commission of only 2% - 12.5% of the product's list price. Plaintiffs argues the amount of Synthes' deductions reflect an attempt to shift the cost of doing business to the sales consultant in violation of California law. Second, Plaintiff challenges the instances in which deductions are taken, e.g., the "accounts receivable," "customer service" and non-payment deductions. [*58] Plaintiff argues the instances in which Synthes

takes deductions are beyond the Deduction Class' members control and unlawful under California law.

## 2. *Rule 23(a)* Requirements

### i. Numerosity

Synthes does not dispute the Deduction Class is sufficiently numerous such that joinder of all class members is impracticable. Plaintiff's evidence shows that the proposed Deductions Class numbers at least 180 people.[IX] *See* Ex. 1 at 3584-88. This Court concludes numerosity is met.

> 18    Synthes submitted evidence indicating that thirty-eight of these class members have never been assessed a deduction. Explained in greater detail below, the Court amends the Deduction Class definition to require the putative class member incur a deduction at some point during the relevant class period.

### ii. Commonality

Plaintiff argues commonality is met because Synthes' deductions policy uniformly applies to all Deduction Class members. Plaintiff argues the Court will not need to review each deduction or otherwise conduct an "as-applied" analysis to determine liability because the legality of the deduction policy can be evaluated on the face of the written policy itself. Synthes does not dispute that its deduction policy is [*59] applied uniformly to all sales consultants. Synthes also does not suggest that an evaluation of the types of deductions taken, e.g., accounting, customer service and non-payment, requires individualized inquiries.

Instead, Synthes argues that a comparison of the deduction percentage and the commission percentage is an improper way to evaluate the legitimacy of Synthes' deduction policy, and that a proper inquiry into the merits of Synthes' deduction policy entails individual inquiries. Synthes argues Plaintiff's "simplistic argument that Synthes' deduction rate (50%) exceeds [the sales consultant's] commission rates (up to 12.5%), *see* Pl.'s Mem. At 14, ignores entirely that Synthes advances commissions and, by policy, takes deductions only from those advanced payments." Synthes' Opp., 27-28, Doc. 115. Synthes argues, a claim that deductions reduced "accrued" commissions could only be shown in the following situations: (1) the sales consultant "will need to show that his deductions exceeded his advances in a specific pay period;" and (2) the sales consultant will "need to show that, upon termination, his combined deductions exceeded his combined advances (and each [sales consultant] [*60] will not even have a ripe claim until he

terminates employment)." According to Synthes, these inquiries require individualized merits determinations.

The Court disagrees with Synthes' approach to Deduction Class liability. At the core of Synthes' position are two premature, unsupported merits conclusions. First, Synthes takes the position that because commissions are not yet earned, Synthes may take any amount of deductions from advanced commissions.[IV] Second, Synthes concludes that a deduction claim exists only when a sales consultant realizes a net loss of income at some point during Synthes' employ. Both of these arguments present merits inquiries common to all Deduction Class members. Can Synthes take any deduction amount it pleases from advanced commissions? Do Deduction Class members need to show they incurred a net loss in Synthes' employ? These are common questions, capable of generating common answers that will resolve the deduction claims in one stroke.

> 19    While not explicitly stated in Synthes' opposition, Synthes confirmed this was its position at oral argument.

Synthes maintains an express, written deduction policy that applies uniformly to all Deduction Class members. The [*61] relevant merits inquiries can all be resolved on a class-wide basis. Whether Synthes and Deduction Class members have an established agreement proscribing the conditions necessary to earn a commission is a question common to all Class members. *Koehl, 142 Cal. App. 4th at 1330* ("it is clearly the law in California that a sales[person] is required to repay the excess of advances made over commissions earned when there is an express agreement on the part of the sales[person] to repay such excess.") Whether these uniform conditions are based on Deduction Class member's sales can be answered on a class-wide basis. *Sciborski, 205 Cal. App. 4th at 1168* ("an employer may not require an employee to agree to a wage deduction in the guise of recouping an advance based on conditions that are unrelated to the sale . . .") Whether the types of deductions taken by Synthes, e.g., Accounts Receivable and Customer Service deductions, are permissible is a common question capable of generating common answers. Finally, whether the amount of deduction (50% of the product's list price) compared with the commission advanced (2% - 12.5% of the product's list price) represents an attempt by Synthes to "shift the [*62] cost of doing business" to Deduction Class members is a common legal question that can be answered for the Class as a whole. Accordingly, whether Synthes' uniform deduction policy violates the California Labor Code and related statutes and case authority presents common questions, capable of generating common answers apt to drive the resolution of this litigation.

### iii. Typicality

Plaintiff's claims are typical of the Deduction Class. Plaintiff alleges he and putative class members suffered similar injuries (decreased commission as a result of unlawful deductions) based on Synthes' identical course of conduct (a uniform and allegedly unlawful deduction policy). Because Plaintiff has suffered an injury similar to members of the proposed classes, this action is based on Synthes' common policies and practices with respect to all class members, and other class members have been injured by the same course of conduct, Plaintiff is typical of the proposed classes. *See Costco, 657 F.3d at 984*.

Synthes argues that typicality is not met because "at least *thirty-eight* putative class members had no deductions over the class period."[20] Doc. 115, 28: 24-24. (Emphasis in original.) At oral argument, [*63] the Court expressed concerns about including individuals in the Deduction Class who never had a deduction taken against them. In response to questioning from the Court, Plaintiff agreed that the Deduction Class definition should be modified to include only members of the Class who incurred a deduction at some time during the relevant class period. Accordingly, the Court will modify the Deduction Class definition.

> 20    Synthes offers additional typicality arguments relying on the same erroneous assumptions the Court rejected in the commonality discussion. For the same reasons discussed therein, the Court finds these arguments irrelevant to the typicality analysis, and does not address them any further.

### iv. Adequacy

Synthes does not offer any argument concerning the adequacy of Plaintiff or Plaintiff's counsel to represent the proposed Deduction Class.[21] The relief sought by Plaintiff on behalf of the Deduction Class is not in conflict with, or antagonistic to, any other Deduction Class members. Plaintiff's interests are aligned with Deduction Class member's interests in recovering excessive or unwarranted commission deductions. Plaintiff is an adequate representative.[22]

> 21    Synthes opposition [*64] contains a heading that states "Lindell is not a typical or adequate class representative." However, the arguments contained within only address whether Plaintiff is a "typical" representative. Synthes does not provide any reason that Plaintiff or Plaintiff's counsel would not adequately represent the Deduction Class.
> 22    For the same reasons provided in the Court's Expense Class analysis, the Court finds Plaintiff's

counsel will adequately represent the Deduction Class.

### 3. *Rule 23(b)* Requirements

### i. Predominance

Determining whether Synthes' deduction policy violates California law implicates common factual inquiries and common legal questions that apply identically to each class member and predominates over any individual questions. It is undisputed Synthes maintains a uniform deduction policy applicable to all Deduction Class members - both in terms of the amount of deduction taken and the circumstances in which a deduction is taken. The Court can evaluate the legality of the deduction policy based on Synthes' written policy and is thus subject to common proof. *See, In re Taco Bell Wage & Hour Actions, 2012 U.S. Dist. LEXIS 168219, 2012 WL 5932833, at *7 (E.D. Cal. Nov. 27, 2012)* ("individual inquiries are unnecessary [*65] where, as here, the claim is based on an invalid policy"). The common factual and legal issues discussed in the Court's commonality analysis, *supra,* Section III.C.2.ii., are *the* predominant questions that will generate common answers necessary to resolve the Deduction Class's claims.

Synthes argues its policy, as applied, is legal.[23] Synthes additionally argues that common issues do not predominate because the Court will have to determine if each deduction was taken from a class member's accrued commissions. Thus, the Court will have to assess the following individual inquiries: "(1) the amount of the deduction, (2) the size of the [sales consultant's] bank of unaccrued commissions (which itself requires the Court to determine when Synthes obtained payment for each invoiced sale by the [sales consultant] and each advance was earned), (3) whether the actual deduction exceeded the value of the commissions advanced to the [sales consultant];" and (4) "[i]f the deduction was taken from accrued commissions, the Court will also need to determine whether the deduction was reversed." (Synthes' Opp., Doc. 115, 29-30.) The Court has already rejected Synthes' first three arguments and addresses [*66] them no further. *See, supra,* Section III.C.2.ii. As for Synthes' final argument, the Court is not persuaded.

> 23    Of course, at the class certification stage, the legality of Synthes' deduction policy is not at issue.

Synthes' 2007 and 2010 Sales Policy Manuals explicitly state that "policy dictates that extensions or reversals will not be granted." Doc. 89, Attach. 2 at 440; Attach. 3 at 495. While Synthes has submitted declarations stating that managers do in fact have the discretion to reverse a deduction, Synthes' Opp., Doc. 115 at 14,

Synthes' own 30(b)(6) witness states that "it usually is pretty difficult to get that done, [i.e., reverse a deduction]." Thus, it appears to the Court that the occasional reversal of a deduction is rare and at most a minor divergence from Synthes' overarching policy. Ultimately, an inquiry into the few instances where a deduction was reversed is a damages issue and does not predominate over common issues.

## ii. Superiority

Class adjudication is the superior method for resolving Deduction Class's claims. No class member would be required to individually establish her right to recover because all the merits determinations can be made on a class-wide basis.  [*67] There is no evidence that Deduction Class members have any interest in controlling prosecution of their claims separately. The Court is not aware of any other litigation raising the claims at issue here which have been commenced elsewhere on behalf of Deduction Class Members. Concentrating this litigation in California is efficient because the entire Class is composed of California residents. There will not be any undue difficulty in managing this litigation as a class action and because Deduction Class members can be identified from Synthes' records, individual notice can be readily accomplished. Moreover, while individual damage calculations are likely -- assuming liability is established -- the class size is sufficiently small such that individual damage calculations will not create any manageability problems. This employment action is well suited for class treatment, and litigation on a class basis is a superior method for adjudicating Plaintiffs' claims.

## CONCLUSION AND RECOMMENDATIONS

Having carefully considered the parties' submissions and the entire record in this case, the Court RECOMMENDS Plaintiff's Motion for Class Certification be GRANTED. The Court RECOMMENDS the following [*68] classes be certified:

1) An "Expense Class" of all former, current, and future sales consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, and who are subject to the following "straight commission" compensation policies:

a) The policy that sales consultants from the Trauma and Spine Sales Divisions who receive "straight commission"

"are not eligible for an automobile allowance or in-territory business expense reimbursement"; and

b) The policy that sales consultants from the CMF Sales Division receive "a predetermined base salary of $30,000, plus a higher level of commission with no expenses;" and

2) A "Deductions Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, who at some time during Synthes' employ had a deduction assessed against them.

The Court FURTHER RECOMMENDS that Troy M. Lindell be appointed as Class representative.

The Court FURTHER RECOMMENDS the law firm of Lewis Feinberg  [*69] Renaker & Jackson be appointed as Lead Class Counsel, and the law firm of Lang, Richert & Patch be appointed as Class Counsel.

The Court will set a scheduling conference upon the conclusion of this motion.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to Title *28 of the United States Code section 636(b)(1)(B)* and this Court's *Local Rule 304*. Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to Title *28 of the United States Code section 636(b)(1)(C)*.

The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst, 951 F.2d 1153 (9th Cir.1991)*.

IT IS SO ORDERED.

Dated: **March 4, 2014**

**/s/ Barbara A. McAuliffe**

UNITED STATES MAGISTRATE JUDGE